Filed 12/12/18

CERTIFIED FOR PUBLICATION

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| SHIRLEAN WARREN,<br><br>    Plaintiff and Appellant,<br><br>v.<br><br>KIA MOTORS AMERICA, INC.,<br><br>    Defendant and Respondent. | E068348<br><br>(Super.Ct.No. CIVDS1414575)<br><br>OPINION |

APPEAL from the Superior Court of San Bernardino County.  John M. Pacheco, Judge.  Reversed with directions.

Rosner, Barry & Babbitt, Hallen D. Rosner, Shay Dinata-Hanson, and Michelle A. Cook for Plaintiff and Appellant.

Bowman and Brooke, Brian Takahashi, Joyce Peim; SJL Law, Julian G. Senior, Stefanie G. Jo, and Marcelo Lee for Defendant and Respondent.

## I. INTRODUCTION

A jury awarded plaintiff and appellant, Shirlean Warren, $17,455.57 in damages pursuant to the Song-Beverly Consumer Warranty Act (Civ. Code, § 1790 et seq.)[1] (the Song-Beverly Act), commonly known as California's "lemon law." (*Goglin v. BMW of North America, LLC* (2016) 4 Cal.App.5th 462, 467, fn. 5 (*Goglin*).) As part of the judgment, the court awarded Warren $115,848.24 in attorney fees and $24,436.65 in costs and expenses. (§ 1794, subd. (d).)

In this appeal, Warren challenges her attorney fee award and her costs and expenses award. In the trial court, Warren requested $526,582.89 in attorney fees ($351,055.26 in lodestar fees, times a multiplier of 1.5) and $40,151.11 in costs and expenses. The court applied a negative multiplier of 33 percent (33%) to the lodestar figure of $351,055.26, resulting in the $115,848.24 attorney fee award ($351,055.26 times .33 equals $115,848.24). The court disallowed two items listed in Warren's memorandum of costs: (1) $9,832.46 in prejudgment interest on the $17,455.57 judgment; and (2) $5,882 for court reporters' trial transcripts. ($40,151.11, less $5,882, less $9,832.46, equals $24,436.65.)

Warren claims the court abused its discretion in applying a 33% negative multiplier to her requested lodestar attorney fees. Warren argues that, by applying the negative multiplier, the court erroneously limited her attorney fee award to a proportion

---

[1] Undesignated statutory references are to the Civil Code unless otherwise indicated.

of her $17,455.57 damages award, and thus used a prohibited means of determining reasonable attorney fees. She also claims she was entitled to recover prejudgment interest on her damages award and that the court erroneously struck the $5,882 expense for trial transcripts from her cost bill.

We conclude that Warren has not shown she was entitled to prejudgment interest on her jury award as a matter of right. (§ 3287, subd. (a).) Nor has Warren shown that the court abused its discretion in refusing to award any prejudgment interest. (§ 3287, subd. (b).) We agree, however, that Warren was entitled to recover the $5,882 expense that her attorneys incurred for trial transcripts. (§ 1794, subd. (d).)

We also conclude the court abused its discretion in applying the 33% negative multiplier to Warren's requested lodestar attorney fees of $351,055. Part of the court's expressed purpose in applying the negative multiplier was to tie the attorney fee award to a proportion of Warren's modest damages award. This was error. Thus, we reverse the attorney fee award and the cost award, and we remand the matter to the trial court to determine a reasonable attorney fee award and to increase the cost award by $5,882.

## II. BACKGROUND

A. *The Litigation Through the Jury Award*[2]

In January 2011, Warren purchased a 2010 Kia Forte priced at $16,375, with express warranties. Warren's total purchase price for the vehicle was $24,737.45,

---

[2] The record does not include a reporter's transcript of the jury trial. Thus, we describe the facts of the litigation as best we can discern them from the record on appeal. (*Duale v. Mercedes-Benz USA, LLC* (2007) 148 Cal.App.4th 718, 722 (*Duale*).)

3

including taxes, fees, and all finance charges on a five-year loan. Within the first year of its purchase and at 26,600 miles, Warren began having "problems" with the vehicle. Through May 8, 2013, Warren took the vehicle to a Kia-authorized repair facility a total of 14 times. On May 8, Warren traded in the vehicle and purchased a 2013 Kia Forte.

Sometime between May 8, 2013, and June 12, 2014, Warren learned that she could request a "buyback" of her 2010 Kia Forte pursuant to the Song-Beverly Act. On June 12, Warren called Kia's call center, requested a buyback, and was told that her request would be "escalated" or referred to the regional office for review. On June 17, the regional call center called Warren and left a voice mail, telling Warren the case had been "escalated" to their department, they wanted to discuss the case, and asking Warren to return their call. At trial, Warren denied receiving any voice mail or follow-up contact of any kind from the call center. In any event, Kia did not attempt to contact Warren after June 17 and closed the case on July 2, 2014.

Warren later contacted O'Connor & Mikhov LLP (OM Law) concerning her potential lemon law claim. OM Law agreed to take the case and "bear the risk associated with litigating the case on a contingent-fee basis," knowing it "faced a genuine risk of not being paid for its services for years, if at all, while advancing thousands of dollars in costs." Before filing suit in October 2014, OM Law offered to settle the case, but Kia rejected the offer.

In October 2014, OM Law filed Warren's operative original complaint against Kia, alleging Kia violated the Song-Beverly Act by failing to adequately service and

repair "defects and nonconformities" in the 2010 Kia Forte, including "suspension, electrical, interior, and brakes defects" and further alleging Kia failed to conform the vehicle to its express warranties despite a reasonable number of repair attempts. The complaint sought general, special, actual, incidental, and consequential damages according to proof, a civil penalty of twice Warren's actual damages, rescission of the purchase contract, restitution of the amount paid, diminution in value of the vehicle, prejudgment interest, attorney fees, and costs and expenses.

By May 2015, the parties had exchanged some written discovery, but Kia had not offered to settle the case and the case appeared likely to go to trial. Thus, on May 6, 2015, OM Law associated The Altman Law Group (Altman Law) into the case as cocounsel for Warren, with the understanding that Altman Law would serve as Warren's "lead" trial counsel and prepare the case for trial.

In October 2015, Kia offered to settle the case pursuant to what Warren claimed and the trial court ruled was an uncertain and therefore unenforceable Code of Civil Procedure section 998 offer. Kia offered to pay Warren total damages of $12,500—or an unspecified, alternative sum if Warren itemized and proved her incidental and consequential damages to Kia—plus $5,000 for Warren's attorney fees, costs, and expenses. Warren did not accept the offer and allowed it to lapse. The court later ruled the offer was unenforceable because it did not state a "certain" alternative amount in the event Warren did not accept the $12,500 sum. Thus, the court expressly did not disallow

5

any of Warren's postoffer costs or expenses based on the offer.  (Code Civ. Proc., § 998, subd. (e).)

At a mandatory settlement conference in January 2016, the parties did not settle the case and it was ordered to trial.  Despite Altman Law's May 2015 association as lead trial counsel, OM Law attended trial readiness conferences on January 11 and 12, and February 25, 2016.  In June 2016, OM Law associated a third law firm, Wirtz Law APC (Wirtz Law) "to join the case as lead trial counsel and prepare the case for trial" "due to Altman Law's busy trial calendar involving other cases against Kia that caused scheduling conflicts with Kia."  An attorney from Wirtz Law attended trial readiness conferences on June 16, 20, and 23, and July 14, 18, and 21, 2016.  Attorneys for Kia appeared at each trial readiness conference and reported that Kia was not ready for trial because its trial attorney, Brian Takahashi, was engaged in another trial.

Bryan C. Altman of Altman Law attended the first day of trial on June 29, 2016, with two attorneys from Wirtz Law, Richard M. Wirtz and Amy R. Smith.  Mr. Takahashi appeared for Kia, and jury selection began.  The parties were unable to empanel a jury due to the upcoming July 4 holiday, however, so the court and counsel agreed to continue trial to July 18.  The court ordered all counsel to be present on July 18, but Mr. Takahashi was engaged in another trial on July 18 and was later ordered to pay Wirtz Law $2,861.24 in sanctions for his failure to appear on July 18.

Trial resumed on July 25 and was conducted over eight days on July 25 through 28 and August 1 through 4, 2016.  Three attorneys represented Warren at trial:  Mr. Wirtz

6

and Ms. Smith from Wirtz Law, and Roger Kirnos, who "frequently associates or specially appears for purposes of trial" for OM Law clients. Julian Senior represented Kia at trial.

On August 4, 2016, the jury returned a special verdict and awarded Warren total damages of $17,455.57.[3] Although it found Kia willfully failed to repurchase or replace the vehicle, the jury did not award Warren a civil penalty. (§ 1794, subd. (c).) Judgment was entered on September 9, 2016. The judgment indicates that, absent the parties' agreement, the court would determine the amounts of Warren's attorney fees, costs, and expenses pursuant to noticed motions, and amend the judgment to include these amounts.

B. *Warren's Requested Costs and Expenses*

In October 2016, Warren filed a memorandum of costs or cost bill, seeking a total of $40,151.11 in costs and expenses. Kia moved to tax costs, challenging several of the items requested in the cost bill. The court struck two items from the cost bill: (1) Warren's prejudgment interest claim of $9,832.46 on the $17,455.57 award, and (2) $5,882 for the costs of court reporter's transcripts of the trial. Thus, Warren was awarded $24,436.65 in total costs and expenses.

---

[3] The jury found the 2010 Kia Forte had defects which substantially impaired its use, value, or safety and which Kia failed to repair after a reasonable number of attempts or opportunities; Kia failed to promptly replace or repurchase the vehicle; Warren paid $18,378.26 for the vehicle (including finance charges, sales, tax, license fees, registration fees, and other fees) and incurred incidental and consequential damages of $2,707.10. The jury also found the cash value of the vehicle before it was submitted for repair was $16,375 and that Warren put 26,600 miles on the vehicle. The jury calculated the value of the vehicle's use as $3,629.79, resulting in total damages of $17,455.57 ($18,378.26 plus $2,707.10 minus $3,629.79 equals $17,455.57).

7

C. *The Motion for Attorney Fees*

In December 2016, Warren filed a motion for attorney fees, seeking $351,055.26 in lodestar fees (the number of attorney hours worked times the attorneys' hourly rates), plus a lodestar multiplier of 1.5, or an additional $175,527.63, for total requested fees of $526,582.89. The $351,055.26 lodestar figure is comprised of $111,480 for OM Law, $56,576.50 for Altman Law, and $182,998.76 for Wirtz Law. In her motion, Warren argued that the nature and complexity of her case, the skills of her attorneys, and her contingency fee arrangements with her attorneys warranted all of the requested fees. Warren also argued that Kia had engaged in "aggressive" and "scorched earth" litigation tactics, necessitating many of the requested lodestar fees.

An attorney from each of Warren's three law firms submitted supporting declarations: Steve Mikhov of OM law, Mr. Altman of Altman Law, and Mr. Wirtz of Wirtz Law. Each declaration included billing statements describing each attorney task performed, the date the task was performed, the time spent on the task,[4] the attorney who performed the task, the attorney's hourly rate, the amount charged for the task, along with the total hours worked by each attorney and the total amounts charged for each attorney.

OM Law charged for 348.4 hours at hourly rates of $225 to $500, resulting in total fees of $111,480. Eleven attorneys, including Messrs. Mikhov and Kirnos, worked on the case for OM Law. Mr. Mikhov claimed the hourly rates charged were reasonable

---

**4** Wirtz Law and Altman Law charged for time in one-tenth hour increments; OM Law charged in one-quarter hour increments.

because they were consistent with the rates charged by other attorneys who litigate consumer matters, and he submitted evidence that OM Law had been awarded fees in other cases based on similar rates. Mr. Mikhov also argued that lemon law cases are not "simple actions"; rather, they require "a specialized understanding of the full scope of consumer protection laws," the "intricacies of automobiles and a lexicon associated with them," and knowledge of "manufacturers' and dealers' protocols for repairing vehicles." Mr. Mikhov also pointed out that OM Law's billing reflected a substantial amount of uncharged time.

Altman Law charged for 136.17 total hours at hourly rates of $650 for Mr. Altman and $450 for two associates, resulting in its total bill of $56,576.50. Mr. Altman acknowledged that some of the work he and his associates performed "was duplicative or ultimately unnecessary insofar as [he] was not trial counsel at the trial"; thus, he deducted $30,598.50 from his invoice which represented "significant work performed in preparation for trial" that was not being charged.

Wirtz Law charged for 508.40 total hours, including 188 hours for Mr. Wirtz at an average hourly rate of $451.50, and 247.4 hours for Ms. Smith at an average hourly rate of $333.23. These hourly rates charged are lower than Mr. Wirtz's usual hourly rates of $500 and Ms. Smith's usual hourly rate of $400, when these attorneys' uncharged time was taken into account. Two other attorneys at Wirtz Law charged for a total of 73 hours at average hourly rates of $247.13 and $300, also lower than these attorneys' usual hourly

rates of $300 and $400 due to uncharged time. A paralegal worked 7.50 hours at no charge and a legal support person worked 4.30 hours for a total charge of $400.

Wirtz Law's total bill of $182,998.76 included a deduction of $2,861.24 for the sanctions Kia paid to Wirtz Law; otherwise the bill would have been $185,860. As indicated, Wirtz Law served as lead trial counsel and was brought into the case shortly before trial. Its work mainly consisted of attending six trial setting conferences, reviewing pleadings and documents, communicating with attorneys at OM Law, preparing the case for trial, and attending and conducting the trial. Mr. Wirtz presented a United States Consumer Law Attorney Fee Survey Report indicating that the hourly rates charged by Wirtz Law were commensurate with the rates charged by California attorneys who practice consumer law.

In opposing the motion, Kia claimed the hours and rates charged by Warren's three law firms were excessive, given that this was a "simple lemon law case," and 16 attorneys from three different law firms had worked on the case. Kia argued this was a "classic case of excessive billing due to staffing a case with too many attorneys resulting in duplicative, inefficient work." Kia asked the court to limit the attorney fee award to $180,000 for all three firms.

D. *The Trial Court's Rulings on the Attorney Fee and Cost Motions*

A combined hearing on the attorney fee motion and the motion to tax costs was held on March 20, 2017. Following the hearing, the court took the matter under submission and ultimately awarded Warren $115,848.24 in attorney fees and $24,436.65

10

in costs. The trial judge who ruled on the motions (Judge Pacheco) was the same judge who had presided at trial.

At the hearing, Warren's counsel, Mr, Kirnos, pointed out that trial courts in three other recent cases had awarded similar amounts of attorney fees against Kia, namely, $270,000, $280,000, and a "conditional ruling" awarding $350,000. Mr. Kirnos also pointed out that, in *Goglin*, *supra*, 4 Cal.App.4th at pages 473 and 474, the trial court awarded $180,000 in attorney fees, and the *Goglin* court upheld the trial court's approval of a $575 hourly attorney fee rate as appropriate.

Mr. Kirnos stressed that "drastic" reductions had been made to the attorneys' billings in order to eliminate duplicative work and account for "the musical chairs" that were played to get the case to trial. He also cited several examples of Kia's "scorch" and "burn" litigation tactics which caused Warren to incur substantial fees, including a motion for summary judgment and a requested spoliation instruction, both of which Mr. Kirnos argued were "dead on arrival." Mr. Kirnos said he had never been involved in a case that had been as "heavily litigated" as this one, and he argued this was not "an easy case to try." The court noted there was "a disconnect" between the verdict amount of "$17,000" and the over $500,000 in requested attorney fees, and said it believed its tentative award of $115,848.24 in attorney fees was "generous." The court said: "Well, I guess in the back of my head I'm thinking, okay. The verdict is $17,000. The attorney fee request[] is $500,000. So somehow there's a disconnect, in the back of my head, that a 17,000-dollar case results in a 500,000-dollar request in attorney fees. . . . That seems

11

like an exorbitant amount of money. . . . [¶] . . . [¶] . . . I thought I was generous at [$]115[,000]."

In response, Mr. Kirnos told the court, "proportionality is inappropriate"—that is, it is error to tie an attorney fee award to the verdict. The court responded, "I'm not saying that [proportionality is] the basis of my ruling," but the disconnect between the verdict and the fee request does not "rub right" with the court. The court acknowledged there were "a lot of witnesses and a lot of testimony" at trial, and all three firms "did a lot of work," but stressed it was "*three* firms that did a lot of work, *three firms*." (Italics added.) The court asked Mr. Kirnos whether $350,000 in attorney fees would have been incurred by a single law firm, and Mr. Kirnos explained that two firms are usually involved in a consumer warranty case that goes to trial—the firm that initially takes the case, "works on settlements, deals with motions to compel," and takes "some of the depositions." Then a second firm "get[s] in at the end" and tries the case with a "very senior trial attorney" like Messrs. Wirtz or Altman.

In ruling on the motion, the court wrote: "The three firms billed a total of $351,055.26. This is an excessive amount for a non-complex case. The court will exercise its discretion and reduce this amount to 33%, or $115,848.24, of the original requested amount. This amount, *while still much more than the $17,455.57 award*, more accurately reflects the reasonable amount of attorneys fees in a case which was not particularly complex and which was handled by counsel experienced in this area of law. Plaintiff has not demonstrated that this many attorneys, at these high rates, were

12

necessary or reasonable to justify her requested billed amount. Additionally, despite counsel[']s argument that they carefully avoided duplication between the 3 firms, the court is not convinced that the repetitiveness of these types of cases would necessarily require the amount of time requested." (Italics added.)

Next, the court addressed the requested lodestar multiplier of 1.5. The court acknowledged that case law required the court to first "determine a touchstone or lodestar figure based on a careful compilation of the actual time spent and reasonable hourly compensation for each attorney," and that the lodestar figure "may then be augmented or diminished by taking various relevant factors into account, including (1) the novelty and difficult[y] of the questions involved and the skill displayed in presenting them; (2) the extent to which the nature of the litigation precluded other employment by the attorneys; and (3) the contingent nature of the fee award, based on the uncertainty of prevailing on the merits and of establishing eligibility for the award."

The court explained: "[T]he initial [lodestar] amount is based on the reasonable rate for noncontingent litigation of the same type, which amount may then be enhanced (e.g.[,] through the use of a so-called multiplier to account for factors such as the contingent nature of the case[).] The purpose of such adjustment is to fix a fee at the fair market value for the particular action. In effect, the court determines, retrospectively, whether the litigation involved a contingent risk or required extraordinary legal skill justifying augmentation of the unadorned lodestar in order to approximate the fair market rate for such services." The court concluded, "despite [Warren's] arguments with respect

to the contingency risk and difficulty of lemon law cases, the fact remains that this was a relatively straightforward case handled by not one, not two[,] but three law firms who claim a specialty in these matters. They were certainly not precluded from taking other work. Given these facts the court finds that no [positive] multiplier shall be applied."

## III. DISCUSSION

### A. *The Court Abused Its Discretion in Applying a 33% Negative Multiplier to Warren's Lodestar Attorney Fees of $351,055.26*

    1. <u>Applicable Legal Principles, Overview</u>

The Song-Beverly Act is "'manifestly a remedial measure, intended for the protection of the consumer.'" (*Murillo v. Fleetwood Enterprises, Inc.* (1998) 17 Cal.4th 985, 990.) To this end, section 1794, subdivision (d) provides that a prevailing buyer in an action arising under the Song-Beverly Act "shall be allowed by the court to recover as part of the judgment a sum equal to the aggregate amount of costs and expenses, including attorney's fees *based on actual time expended*, determined by the court to have been reasonably incurred by the buyer in connection with the commencement and prosecution of such action." (Italics added.) In enacting this provision, the "Legislature has provided injured consumers *strong encouragement* to seek legal redress in a situation in which a lawsuit might not otherwise have been economically feasible." (*Murillo v. Fleetwood Enterprises, Inc.*, *supra*, at p. 994, italics added.)

The "plain wording" of section 1794, subdivision (d) requires the trial court to "base" the prevailing buyer's attorney fee award "upon actual time expended on the case,

14

as long as such fees are *reasonably* incurred—both from the standpoint of time spent and the amount charged." (*Robertson v. Fleetwood Travel Trailers of California, Inc.* (2006) 144 Cal.App.4th 785, 817.) Likewise, when the prevailing buyer has a contingency fee arrangement, he or she is entitled to recover "reasonable attorney fees for time reasonably expended." (See *Nightingale v. Hyundai Motor America* (1994) 31 Cal.App.4th 99, 105, fn. 6.) This is consistent with California's approach to determining a reasonable attorney fee in various statutory and contractual contexts, which approach "ordinarily begins with the 'lodestar,' i.e., the number of hours *reasonably* expended multiplied by the *reasonable* hourly rate." (*PLCM Group, Inc. v. Drexler* (2000) 22 Cal.4th 1084, 1095, italics added.)

The lodestar figure may then be adjusted based on factors specific to the case, in order to fix the fee at the fair market value of the legal services provided. (*Ketchum v. Moses* (2001) 24 Cal.4th 1122, 1132 ["The lodestar is the basic fee for comparable legal services in the community."]; *Serrano v. Priest* (1977) 20 Cal.3d 25, 49.) These case-specific, lodestar adjustment factors may include, without limitation: "(1) the novelty and difficulty of the questions involved, (2) the skill displayed in presenting them, (3) the extent to which the nature of the litigation precluded other employment by the attorneys, (4) the contingent nature of the fee award. [Citation.]" (*Ketchum v. Moses*, *supra*, at p. 1132.) The "procedural demands" of the case may also be considered. (*Nightingale v. Hyundai Motor America*, *supra*, 31 Cal.App.4th at p. 104.) The lodestar adjustment method "anchors the trial court's analysis to an objective determination of the value of

15

the attorney's services," and thus ensures that the amount awarded is not arbitrary. (*PLCM Group, Inc. v. Drexler*, *supra*, 22 Cal.4th at p. 1095.)  A prevailing buyer in an action arising under the Song-Beverly Act has the burden of establishing that his or her requested attorney fees were "'allowable,'" "'reasonable in amount,'" and "'reasonably necessary to the conduct of the litigation.'" (*Goglin*, *supra*, 4 Cal.App.5th at p. 470.)

We review the trial court's attorney fee award under the Song-Beverly Act for an abuse of discretion, and in doing so we are guided by settled principles.  (*Goglin*, *supra*, 4 Cal.App.5th at p. 470.)  "'We presume the trial court's attorney fees award is correct, and "[w]hen the trial court substantially reduces a fee or cost request, we infer the court has determined the request was inflated." [Citation.]  "The '"experienced trial judge is the best judge of the value of professional services rendered in his [or her] court, and while his [or her] judgment is of course subject to review, it will not be disturbed unless the appellate court is convinced that it is clearly wrong."'"'  [Citation.]" (*Ibid*.)

2. Analysis

Warren claims the court abused its discretion in applying a negative 33% multiplier to her lodestar figure of $351,055.26, resulting in a fee award of $115,848.24, or one-third of the lodestar fees billed by Warren's three law firms.  She argues that when, as here, an across-the-board percentage cut is applied to a  "'voluminous fee application,'" the cut is "'subject to heightened scrutiny'" on appeal. (*Kerkeles v. City of San Jose* (2015) 243 Cal.App.4th 88, 102 (*Kerkeles*).)

16

Additionally, Warren claims that a court abuses its discretion when it ties an attorney fee award to a *proportion* of the prevailing buyer's damages award in an action arising under the Song-Beverly Act. She claims a rule of proportionality is inconsistent with the legislative policy, expressed in section 1794, subdivision (d), of allowing a prevailing buyer to recover a *reasonable* attorney fee, and that such a rule of proportionality should be prohibited because it will "make it difficult, if not impossible" for individuals with meritorious lemon law claims to obtain redress from the courts. (*Graciano v. Robinson Ford Sales, Inc.* (2006) 144 Cal.App.4th 140, 164 (*Graciano*).)

We agree that these claims have merit. As we explain, it is inappropriate and an abuse of a trial court's discretion to tie an attorney fee award to the amount of the prevailing buyer/plaintiff's damages or recovery in a Song-Beverly Act action, or pursuant to another consumer protection statute with a mandatory fee-shifting provision. (See *Graciano*, *supra*, 144 Cal.App.4th at p. 164.) Thus, when a trial court applies a substantial negative multiplier to a presumptively accurate lodestar attorney fee amount, the court must clearly explain its case-specific reasons for the percentage reduction. (*Kerkeles*, *supra*, 243 Cal.App.4th at pp. 102-104.) If, as occurred here, the reasons for the reduction include tying the fee award to some proportion of the buyer's damages recovery, the court abuses its discretion.

*Graciano* is instructive on the application of a proportionality rule, or the practice of tying an attorney fee award to the plaintiff's damages or settlement recovery. The plaintiff, Graciano, was awarded substantially reduced attorney fees, not under the Song-

17

Beverly Act, but under two other consumer protection statutes with mandatory fee shifting clauses—the Automobile Sales Finance Act (ASFA, § 2981 et seq.) and the Consumers Legal Remedies Act (CLRA, § 1750 et seq.) (*Graciano*, *supra*, 144 Cal.App.4th at p. 145.) Graciano appealed, claiming among other things that the trial court erroneously "capped" her attorney fee award to a percentage of her settlement recovery, and the *Graciano* court agreed. (*Id*. at pp. 145, 161-164.)

A jury had awarded Graciano $11,191.40 for the defendant's ASFA and CLRA violations, and, for purposes of punitive damages, found the defendant violated the CLRA by engaging in conduct with malice, oppression, and fraud. (*Graciano*, *supra*, 144 Cal.App.4th at p. 147.) Before the jury began deliberating Graciano's punitive damages claim, the parties settled the case for a $45,000 payment to Graciano in exchange for her dismissal of all her claims with prejudice. (*Ibid*.) Graciano then sought $249,365.36 in attorney fees and costs under the CLRA and AFSA. (*Ibid*.) She claimed lodestar fees of $109,468.50, times a multiplier of 2.0 due to the contingent nature of her attorneys' representation, the delay in paying her attorneys, the results achieved, and the complexity of the issues. (*Ibid*.)

The trial court awarded Graciano only $27,570 in attorney fees, even though she had prevailed on her ASFA and CLRA claims. (*Graciano*, *supra*, 144 Cal.App.4th at p. 147.) In calculating the $27,570 fee, the trial court reduced the hourly rates of Graciano's three attorneys to a blended rate of $250, less than their requested hourly rates of $350, $275, and $270, then applied the $250 rate to the total hours expended of 367.6, resulting

18

in a revised lodestar figure of $91,900. (*Id*. at p. 148.) Next, the trial court applied a negative multiplier of .30, resulting in the $27,570 fee award ($91,900 times .30 equals $27,570). (*Id*. at p. 162.) The trial court noted that the settlement was for $45,000 plus any attorney fees the court might award, and contingency fee agreements commonly required the plaintiff to pay approximately 40 percent of the recovery. (*Ibid*.) Thus, if $45,000 represented Graciano's 60 percent portion of the total settlement, then 40 percent of the settlement would be $30,000 ($75,000 times .40 equals $30,000; $75,000 times .60 equals $45,000). The application of the .30 negative multiplier to the adjusted lodestar figure of $91,900 resulted in the fee award of $27,570, which the trial court found was "within the market place range of fees." (*Ibid*.)

The *Graciano* court found two problems with the trial court's fee analysis which are potentially relevant here on remand. First, the trial court's reduction of the attorneys' requested hourly rates to $250 was an abuse of the trial court's discretion. (*Graciano*, *supra*, 144 Cal.App.4th at pp. 154.) Graciano's attorneys had adduced *unchallenged evidence* that their requested hourly rates were "well within the range charged" by attorneys engaged in similar practice areas and were appropriate and reasonable in the relevant geographical area. (*Id*. at p. 155.) The defendant did not dispute this evidence, but argued the court should base the hourly rates on Imperial County standards. (*Ibid*.) The trial court limited the hourly rates to $250 because this was the hourly rate set or allowed for *expert testimony* in Imperial County, pursuant to local rule 3.12. (*Id*. at pp. 155-156.) This was an abuse of discretion, both because the trial court did not

19

objectively determine "the prevailing rate in the community for *comparable* professional legal services" (*id*. at p. 156; *PLCM Group v. Drexler*, *supra*, 22 Cal.4th at p. 1096 [reasonable hourly rate is that prevailing in community for similar work]) and because "Graciano's *unrebutted* declarations established the prevailing rates in the region for attorneys with comparable skills and expertise, and her evidence compelled a finding that the requested hourly rates were within the reasonable rates for purposes of setting the base lodestar amount." (*Graciano*, *supra*, at p. 156, italics added.)

Second, the *Graciano* court faulted the trial court's application of the .30 negative multiplier to the adjusted lodestar fees of $91,900, because the trial court's goal was to arrive at a reasonable *contingency* fee of approximately 40 percent of Graciano's settlement recovery of $45,000 plus attorney fees. (*Graciano*, *supra*, 144 Cal.App.4th at pp. 148, 161-164.) The court explained that, "because this matter involve[d] an individual plaintiff suing under consumer protection statutes involving mandatory fee-shifting provisions, the legislative policies are in favor of Graciano's recovery of *all attorney fees reasonably expended, without limiting the fees to a proportion of her actual recovery*." (*Id*. at p. 164, italics added.) The court drew a direct analogy to attorney fee applications in civil rights cases: "The circumstances here are analogous to those addressed by the United States Supreme Court in the civil rights context: 'A rule that limits attorney's fees in civil rights cases to a proportion of the damages awarded would seriously undermine Congress' purpose in enacting [42 United States Code section] 1988. Congress enacted [42 United States Code section] 1988 specifically because it found that

20

the private market for legal services failed to provide many victims of civil rights violations with effective access to the judicial process. [Citation.] These victims ordinarily cannot afford to purchase legal services at the rates charged by the private market. . . . Moreover, the contingent fee arrangements that make legal services available to many victims of personal injuries would often not encourage lawyers to accept civil rights cases, which frequently involve substantial expenditures of time and effort but produce only small monetary recoveries.' [Citation.] 'A rule of proportionality would make it difficult, if not impossible, for individuals with meritorious civil rights claims but relatively small potential damages to obtain redress from the courts.' [Citation.]" (*Ibid*.)

*Graciano*'s reasoning applies with equal force here, a case involving a prevailing buyer seeking attorney fees under the Song-Beverly Act, another consumer protection statute which, like the CRLA and the ASFA, includes a mandatory fee-shifting provision. (§ 1794, subd. (d).) Here, unlike the trial court in Graciano, the trial court *did not* reduce the requested hourly rates of Warren's attorneys and *did not* attempt to calculate a *contingency fee award* based on Warren's $17,455.57 damages award. But the trial court's comments at the hearing and in its written ruling on the attorney fee motion indicate that the court applied a 33% negative multiplier to Warren's requested lodestar fees of $351,055.26, with *at least the partial goal* of arriving at an attorney fee award that was roughly *proportional* to or more in line with Warren's modest $17,455.57 damages award. This part of the court's analysis was "'clearly wrong'" and an abuse of the court's discretion. (*Goglin*, *supra*, 4 Cal.App.5th at p. 470.)

21

That said, the court's other reasons for selecting the negative 33% multiplier were appropriate. (*Ketchum v. Moses*, *supra*, 24 Cal.4th at p. 1132 [court may consider various case-specific factors in adjusting lodestar figure to arrive at reasonable fee].) As indicated, in its ruling on the attorney fee motion the court observed: "The three firms billed a total of $351,055.26. This is an excessive amount for a non-complex case. The court will exercise its discretion and reduce this amount to 33%, or $115,848.24, of the original requested amount. This amount, *while still much more than the $17,455.57 award*, more accurately reflects the reasonable amount of attorneys fees in a case which was not particularly complex and which was handled by counsel experienced in this area of law. Plaintiff has not demonstrated that this many attorneys, at these high rates, were necessary or reasonable to justify her requested billed amount. Additionally, despite counsel[']s argument that they carefully avoided duplication between the 3 firms, the court is not convinced that the repetitiveness of these types of cases would necessarily require the amount of time requested." (Italics added.)

The court properly declined to reduce the requested hourly rates of Warren's attorneys and properly anchored its attorney fee award to Warren's requested lodestar fees of $351,055.26. Warren adduced unrebutted evidence that her attorneys' requested hourly rates were within the range of the hourly rates charged by other *plaintiffs'* attorneys practicing consumer law. (*Graciano*, *supra*, 144 Cal.App.4th at p. 156 [reasonable hourly rate is that prevailing in community for similar work]; *Horsford v. Board of Trustees of California State University* (2005) 132 Cal.App.4th 359, 396

[verified attorney time records are presumptively correct].) Kia did not rebut Warren's evidence that her attorneys' hourly rates were reasonable. Rather, Kia claimed the hourly rates of Warren's *plaintiff's* attorneys should be limited to the lower hourly rates charged by Kia's *defense attorneys*. This was not a good comparison, given that Warren's plaintiff's attorneys' work pursuant to contingency arrangements and Kia's defense attorneys do not. Kia also generally criticized each time entry of Warren's attorneys as excessive and also generally criticized the overall time Warren's attorneys spent on the case as excessive. But the aggregate hours expended by Warren's attorneys may appropriately be adjusted by applying a negative multiplier to the lodestar figure. (*Graciano*, *supra*, at pp 159-161 [negative multipliers are appropriate in cases involving mandatory fee-shifting statutes].)

The problem with the trial court's analysis is that we are unable to distinguish the extent to which the court's choice of the 33% negative multiplier was based on the court's expressed and erroneous goal of arriving at a fee award that was roughly proportional to Warren's modest $17,455.57 damages award. The court erred to the extent it selected the negative multiplier to make the fee award roughly proportionate to Warren's modest damages award. But the court was within its discretion to the extent it selected the multiplier to arrive at a reasonable fee based on the factors specific to the case, including the excessive time spent on the "not so complex case" by Warren's attorneys in the aggregate.

It is clear that Warren's excessive lodestar fee occurred principally because her original attorneys, OM Law, were unable or unwilling to try the case. As a result, OM Law had to bring in not one, but two other law firms, namely, Altman Law after it became clear the case had to be tried, and Wirtz Law after Mr. Altman was unavailable after the trial was continued. Warren also had *three* attorneys representing her at the eight-day trial. As the court found, this was excessive and resulted in duplicative charges beyond the uncharged time reflected in counsel's billing statements. That said, the delay in the trial and the need to bring in Wirtz Law, and Mr. Wirtz as Warren's lead trial counsel, was due to Kia, whose initial trial attorney, Mr. Takahashi, was sanctioned for not being available when the trial was to resume. Warren also adduced unrebutted evidence that Kia engaged in "scorched earth" litigation tactics that were responsible for many of the hours Warren's attorneys expended before trial. On remand, the court should consider all of these and other relevant circumstances in selecting an appropriate multiplier in order to determine a reasonable fee award for Warren. (*Nightingale v. Hyundai Motor America*, *supra*, 31 Cal.App.4th at p. 104 [complexity of case and its procedural demands are relevant in selecting lodestar multiplier].)

We have effectively applied "heightened scrutiny" to the court's selection of the 33% negative multiplier to Warren's lodestar figure. This was appropriate. In consumer law cases, as in civil rights cases, when a "'voluminous fee application'" is made, as it was here, the court may, as it did here, "'make across-the-board percentage cuts either in the number of hours claimed or in the final lodestar figure.'" (*Kerkeles*, *supra*, 243

24

Cal.App.4th at p. 102; *Gates v. Deukmejian* (9th Cir. 1992) 987 F.3d 1392, 1399.) But the court must clearly explain its reasons for choosing the *particular* negative multiplier that it chose; otherwise, the reviewing court is unable to determine that the court had valid, specific reasons for its across-the-board percentage reduction. (*Kerkeles*, *supra*, at pp. 102-104 ["'We can't defer to reasoning that we can't review . . . .'"].) Here, the trial court clearly explained its reasons for selecting the 33% negative lodestar multiplier. But that explanation shows the court chose the multiplier, in part, to arrive at a fee award that was roughly proportionate to Warren's $17,455.57 damages award. As discussed, this was error and must not be repeated on remand. (See *Mountjoy v. Bank of America, N.A.* (2016) 245 Cal.App.4th 266, 280-281 [70 percent negative lodestar multiplier erroneously applied based on evidence that 70 percent of counsel's time entries were "flawed"].)

B. *Warren's Trial Transcripts Expense of $5,882 Was Erroneously Excluded From Her Cost and Expense Award, but Her Prejudgment Interest Claim Was Properly Denied*

Warren sought to recover $40,151,11 in costs and expenses from Kia. (§ 1794, subd. (d).) The court granted Kia's motion to tax costs in part by striking two items of requested costs and expenses: (1) $5,882 for the cost of court reporter trial transcripts; and (2) $9,832.46 for prejudgment interest on the $17,455.57 jury award from the date Warren purchased the vehicle in January 2011. These deductions resulted in a total cost and expense award of $24,436.65.

25

Warren claims the court erroneously disallowed both items.  We agree that the $5,882 claim for trial transcripts was erroneously disallowed.  (§ 1794, subd. (d).)  But we disagree that Warren was entitled to prejudgment interest on any part of her $17,455.47 jury award.  As the trial court found, Warren's damages of $17,455.47 were neither certain nor capable of being made certain when she purchased the vehicle or at any other point prior to trial.  (§ 3287, subd. (a).)  For the same reasons, the court did not abuse its discretion in refusing to award Warren prejudgment interest on the award from the date she filed her complaint.  (*Id*., subd. (b).)

       1.  <u>The $5,882 Trial Transcripts Expense Should Have Been Allowed</u>

In disallowing Warren's $5,882 claim for trial transcripts, the court reasoned that, under Code of Civil Procedure section 1033.5, certain cost items, including the cost of "[*t*]*ranscripts of court proceedings not ordered by the court*" "are not allowable as costs" under Code of Civil Procedure section 1032[5] unless the item is "expressly authorized by law."  (Code Civ. Proc., § 1033.5, subd. (b)(5).)  The court noted that Civil Code section 1794, subdivision (d) does not "expressly authorize" reimbursement for trial transcripts which are not court-ordered, even though the statute "refers generally to reimbursement of costs and expenses."  This was error.

As explained in *Jensen v. BMW of North America, Inc.* (1995) 35 Cal.App.4th 112, in enacting Civil Code section 1794, subdivision (d) the Legislature intended the

---

[5]  Code of Civil Procedure section 1032, subdivision (b) provides:  "Except as otherwise expressly provided by statute, a prevailing party is entitled as a matter of right to recover costs in any action or proceeding."

26

phrase "costs and expenses" to cover items not included in "the detailed statutory definition of 'costs'" set forth in Code of Civil Procedure section 1033.5. (*Jensen v. BMW of North America, Inc.*, *supra*, at pp. 137-138.) Civil Code section 1794, subdivision (d) provides, in relevant part: "If the buyer prevails in an action under this section, the buyer shall be allowed by the court to recover as part of the judgment a sum equal to the aggregate amount of costs *and expenses* . . . determined by the court to have been reasonably incurred by the buyer in connection with the commencement and prosecution of such action." (Italics added.)

Additionally, it is indisputable that Warren "reasonably incurred" the $5,882 cost of the trial transcripts "in connection with the . . . prosecution of [the] action." (§ 1794, subd. (d).) This was an eight-day jury trial. As a practical matter, Warren would have been unable to defend the jury award without the trial transcripts. At the very least, Warren would have incurred additional expenses and great difficulty in defending the award without the trial transcripts, in the event Kia challenged the jury award in posttrial proceedings or on appeal. For these reasons, the $5,882 item for trial transcripts was erroneously excluded from Warren's cost and expense award.

2. Warren's Prejudgment Interest Claim Was Properly Denied

Warren sought prejudgment interest of $9,832.46 on her $17,455.57 jury award, calculated at the legal rate of 10 percent per annum, from January 11, 2011, the date she purchased her vehicle, through September 9, 2016, the date judgment was entered. (§ 3287 subd. (a).) Alternatively, she sought prejudgment interest of $3,384.24,

27

calculated at 10 percent per annum from October 1, 2014, the date she filed her complaint, to the date judgment was entered.

(a) *Section 3287, Subdivision (a)*

Section 3287, subdivision (a) allows a person to recover prejudgment interest on "damages certain, or capable of being made certain by calculation" *from the day* such damages are certain or capable of being made certain.[6] "[T]he court has no discretion, but must award prejudgment interest upon request, from the first day there exists both a breach and a liquidated claim." (*North Oakland Medical Clinic v. Rogers* (1998) 65 Cal.App.4th 824, 828.) Prejudgment is an element of damages, not a cost. (*Id*. at p. 830.) The Song-Beverly Act does not preclude an award of prejudgment interest under section 3287, subdivision (a). (*Doppes v. Bentley Motors, Inc.* (2009) 174 Cal.App.4th 1004, 1010.)

Warren claims the entire $17,455.57 amount of her jury award was certain or capable of being made certain "by looking at the sale contract." We disagree. In denying Warren's prejudgment interest claim, the trial court relied on *Duale*, *supra*, 148 Cal.App.4th 718. We agree that *Duale* is on point and persuasive. The *Duale* court concluded that the lower court had properly disallowed prejudgment interest on the plaintiff's jury award under the Song-Beverly Act because the amount of the award was

---

[6] Section 3287, subdivision (a) provides, in relevant part: "A person who is entitled to recover damages certain, or capable of being made certain by calculation, and the right to recover which is vested in the person upon a particular day, is entitled also to recover interest thereon from that day . . . ."

28

dependent upon the jury's resolution of several disputed warranty-related issues, and thus, the amount of the award could not have been determined before trial.  (*Duale*, *supra*, at p. 729.)  The parties in *Duale* disputed, and the jury in *Duale* had to determine "(1) whether any of the many defects alleged in the complaint represented a nonconformity, (2) whether any such nonconformity 'substantially impaired [the] use, value, or safety' of the vehicle," and (3) for any such nonconformity, the mileage at which the plaintiffs first presented the car to the defendant for repair.  (*Ibid.*; see §§ 1793.2, subd. (d)(2)(C), 1794, subd. (b).)  Thus, the *Duale* plaintiffs' breach-of-warranty damages could not have been determined before trial, and an award of prejudgment interest was therefore inappropriate.  (*Duale*, *supra*, at p. 729.)

As the *Duale* court explained:  """Damages are deemed certain or capable of being made certain within the provisions of subdivision (a) of section 3287 where there is essentially no dispute between the parties concerning the basis of computation of damages if any are recoverable but where their dispute centers on the issue of liability giving rise to damage." [Citations.]' [Citation.]  Thus, ""[t]he test for recovery of prejudgment interest under [Civil Code] section 3287, subdivision (a) is whether *defendant* actually know[s] the amount owed or from reasonably available information could the defendant have computed that amount.  [Citation.]' [Citations.]  'The statute . . . does not authorize prejudgment interest where the amount of damage, as opposed to the determination of liability, "depends upon a judicial determination based upon conflicting evidence and it is not ascertainable from truthful data supplied by the claimant

to his debtor." [Citations.]' [Citation.] Thus, *where the amount of damages cannot be resolved except by verdict or judgment, prejudgment interest is not appropriate*. [Citation.]" [Citation.]' [Citations.]" (*Duale*, *supra*, 148 Cal.App.4th at p. 729.)

The trial court here disallowed Warren's prejudgment interest claim for the same reasons cited in *Duale*. In denying Warren's prejudgment interest claim, the court found the jury had to determine "(1) whether any of the many defects alleged in the complaint represented a nonconformity, (2) whether any such nonconformity substantially impaired [the] use, value, or safety of the vehicle, and (3) then to determine—for any such nonconformity—the mileage at which [Warren] first presented the car to [Kia] for repair." (See *Duale*, *supra*, 148 Cal.App.4th at p. 729.) Warren has not shown that these warranty-related issues were not disputed at trial. Indeed, the record does not include any trial transcripts, even though Warren's counsel spent $5,882 to obtain trial transcripts. In addition, the jury's special verdict supports the trial court's finding that these warranty-related issues were disputed at trial, and therefore, that Warren's breach-of-warranty damages could not have been determined at any point before trial, including "by looking at the sale contract."[7]

---

[7] In its special verdict, the jury found: (1) Warren's vehicle had (unspecified) defects which substantially impaired its use, value, or safety, and which Kia failed to repair after a reasonable number of attempts or opportunities; (2) Kia failed to promptly replace or repurchase the vehicle; (3) Warren paid $18,378.26 for the vehicle through the time of trial (including finance charges, sales tax, license fees, registration fees, and other fees); and (4) Warren incurred incidental and consequential damages of $2,707.10. The jury also found the cash value of the vehicle before it was submitted to Kia for repair was $16,375, and Warren put 26,600 miles on the vehicle. The jury thus calculated the value

*[footnote continued on next page]*

Even if Warren's breach-of-warranty damages were certain or capable of being made certain either from the sales contract or other information available to Kia before trial, Warren has not shown that her incidental and consequential damages of $2,707.10—a key component of her $17,455.57 jury award[8]—were certain or capable of being made certain before trial—based on any information available to Kia. As indicated, prejudgment interest is not authorized under section 3287, subdivision (a) where the amount of the damages is either disputed or cannot be determined from information available to the debtor. (*Duale*, *supra*, 148 Cal.App.4th at p. 729.)

Warren necessarily incurred her incidental and consequential damages for Kia's breach of the vehicle's express or implied warranties after she purchased the vehicle. Thus, those damages could not be ascertained "by looking at the sale contract." In addition, Kia's Code of Civil Procedure section 998 offer (which the trial court later found was uncertain and invalid) indicated Kia was unaware of the amount of Warren's incidental and consequential damages when Kia made the offer in October 2015. Warren has pointed to no evidence that Kia was informed of the amount of her incidental and consequential damages before trial, or that Kia possessed any information upon which it could have calculated those damages before trial. (Cf. *Leaf v. Phil Rauch, Inc.* (1975) 47

---

*[footnote continued from previous page]*
*[footnote continued from previous page]*
of the vehicle's use as $3,629.79, resulting in total damages of $17,455.57 ($18,378.26 plus $2,707.10 minus $3,629.79 equals $17,455.57).

[8] See footnote 7, *ante*.

Cal.App.3d 371, 375-377 [plaintiffs entitled to prejudgment interest under Civ. Code, § 3287, subd. (a), where all of their damages for breach of a vehicle sales contract, including their breach of warranty and their incidental and consequential damages, were ascertainable at or after they rescinded the sales contract].) Thus, the trial court properly denied Warren's prejudgment interest claim under Civil Code section 3287, subdivision (a).

(b) *Section 3287, Subdivision (b)*

Warren also claims the court abused its discretion in refusing to award her prejudgment interest under section 3287, subdivision (b), which provides: "Every person who is entitled under any judgment to receive damages based upon a cause of action in contract where the claim was unliquidated, may also recover interest thereon from a date prior to the entry of judgment as the court may, in its discretion, fix, but in no event earlier than the date the action was filed." "The trial judge, not the jury, determines a prejudgment interest award on unliquidated damages." (*North Oakland Medical Clinic v. Rogers*, *supra*, 65 Cal.App.4th at p. 829.)

At the hearing on Kia's motion to tax costs and Warren's motion for attorney fees, Warren's counsel asked the court to exercise its discretion and award Warren prejudgment interest under section 3287, subdivision (b). Although the trial court did not address subdivision (b) of section 3287 in denying Warren's prejudgment interest claim, Warren offers no reason why the court abused its discretion in refusing to award her prejudgment interest, on any part of her $17,455.47 jury award, at any time on or after

October 1, 2014, the date Warren filed her complaint.  Thus, no abuse of discretion has been shown.

## IV.  DISPOSITION

The orders awarding attorney fees, costs, and expenses are reversed, and the matter is remanded to the trial court with directions to (1) increase Warren's cost and expenses award by the $5,882 expense incurred for trial transcripts, and (2) determine a reasonable attorney fee award consistent with the views expressed in this opinion. Warren shall recover her costs and attorney fees on appeal.  (*Graciano*, *supra*, 144 Cal.App.4th at p. 165 ["'Statutory authorization for the recovery of attorney fees incurred at trial necessarily includes attorney fees incurred on appeal unless the statute specially provides otherwise'"]; Cal. Rules of Court, rule 8.278.)

CERTIFIED FOR PUBLICATION


FIELDS
J.


We concur:

MILLER
Acting P. J.

SLOUGH
J.