Filed 7/14/23  Transnational Management Systems v. Pegasus Elite Aviation CA2/7

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| TRANSNATIONAL MANAGEMENT SYSTEMS, LLC et al., <br><br> Plaintiffs and Appellants, <br><br> v. <br><br> PEGASUS ELITE AVIATION, INC., <br><br> Defendant and Respondent. | B317517 <br><br> (Los Angeles County Super. Ct. No. LC100724) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Virginia Keeny, Judge.  Affirmed.

Jordan & LeVerrier and Conrad Jordan for Plaintiffs and Appellants.

David Olson Law Group and David S. Olson; Clark & Trevithick and Jonathan Smoller; Shaw Koepke & Satter and Jens B. Koepke, for Defendant and Respondent.

_____

**INTRODUCTION**

Pegasus Elite Aviation leased two planes for its charter business from Transnational Management Systems, LLC and Transnational Management Systems II, LLC in 2009 and 2010, respectively.[1]  The parties entered into new leases for the same two planes in 2012.  Transnational, however, soon terminated the leases and sued Pegasus for breach of contract and an accounting, seeking over $2.6 million in damages.  Transnational alleged, among other things, Pegasus failed to pay Transnational for all "flight hours," as required by the leases.  Pegasus filed a cross-complaint alleging breach of contract and other causes of action.

During a 20-day court trial the parties stipulated Pegasus did not pay Transnational for almost 500 flight hours.  Ultimately, however, the trial court interpreted the relevant provisions of the leases to exclude over 300 hours of those unpaid flight hours from Transnational's damages.  After finding in favor of Transnational on some of its damages claims, and offsetting Transnational's damages by various amounts the trial court found Transnational owed Pegasus, the court entered judgment

_____

[1]      Separately, we refer to Transnational Management Systems, LLC and Transnational Management Systems II, LLC as Transnational I and Transnational II.  Together, we refer to them as Transnational.

2

in favor of Transnational for $186,691.21.  The court denied Transnational's request for prejudgment interest.

Transnational argues the trial court erred by interpreting a key provision of the 2009 and 2010 leases in favor of Pegasus, failing to apply an adverse inference against Pegasus for willful suppression of evidence, finding Transnational failed to prove some of its damages claims, and denying Transnational's request for prejudgment interest.  In making these arguments, Transnational essentially ignores evidence supporting the trial court's findings and asks us to reweigh the evidence to support Transnational's version of events.  Because that's not something we can do, and because Transnational has not shown the trial court committed any reversible error, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

A.    *Pegasus Leases Two Planes from Transnational*

Timothy Prero, who owns Pegasus, met Adam Victor, who owns Transnational, when Victor was a customer of a previous charter plane company Prero partially owned.  Prero piloted planes chartered by Victor, and over time they became friends.  Victor, who has a master's degree in business administration, asked Prero about the charter industry and how to make money owning a plane.  Prero referred Victor to a plane broker, Anthony Carcione, who helped Victor buy a plane.  Victor formed Transnational I to purchase a Gulfstream IV aircraft with a Federal Aviation Administration registration number N771AV (the 771 plane) and to operate a business that would lease the plane to charter operators.

Transnational leased the 771 plane to Pegasus in November 2009. Prero drafted the lease based on industry templates and language in previous leases he had signed. Carcione and an attorney represented Transnational in the transaction. In 2010 Victor formed Transnational II to purchase a second Gulfstream IV aircraft, this one with Federal Aviation Administration registration number N772AV (the 772 plane), and to operate a business that would lease the second plane to charter operators. Transnational II entered into a lease with Pegasus on June 1, 2010 with terms substantially identical to those in the November 2009 lease.

The 2009 and 2010 leases, among other things, identified the plane leased, set forth the respective obligations of the owners (Transnational I and II) and Pegasus, and prescribed the rate at which Pegasus had to pay Transnational for using the planes. The parties agree the leases required Pegasus to pay Transnational an hourly rate of $5,000, plus a fuel surcharge (in some circumstances), less a commission of 13.5 percent.[2] The parties also agree the leases did not require Pegasus to pay Transnational for owner flights, training flights, or flights to conduct regular maintenance or repairs (collectively, OTM flights, for "owner, training, and maintenance"). And the parties agree the leases required Pegasus to provide monthly statements to Transnational and to settle "all accounts" by "the 20th of the following month." Pegasus complied with this latter provision by

---

[2]    Transnational originally took the position, and Victor stated in declarations, the leases did not entitle Pegasus to a 13.5 percent commission. At trial, however, Victor conceded he negotiated this commission with Prero.

4

sending Transnational a monthly "credit memo" showing the flight hours credited to Transnational for the previous month and an invoice that reconciled those hours with charges for maintenance, management, fuel, and incidentals for owner flights.

The parties do not agree whether the 2009 and 2010 leases required Pegasus to pay Transnational for repositioning flights, which are flights to move a plane to a desired location before or after a paid charter flight, when the customer does not pay to reposition the plane.[3]  In support of their respective positions, the parties cite section 2.6 of the leases, which states in full: "[Pegasus] shall pay Owner [Transnational I or II] $5,000 *per flight hour that aircraft is rented*.  In addition, [Pegasus] shall pay Owner a Fuel Surcharge per hour of $500 per hour.  This fuel surcharge is based on today's average price of $3.75 per gallon.  The fuel surcharge may be adjusted up or down depending on average costs.  Owner acknowledges and agrees to be responsible for any and all expenses associated with the Aircraft, including, but not limited to, fuel, crew, insurance, maintenance, navigational charts, and any other expenses incurred in operating any charter or other Aircraft's flights. A full description of the Annual Operating Budget is attached as 'Appendix A.'"  The italicized (by us) language is at the center of the parties' dispute.

---

[3]     Throughout the trial the parties and witnesses also referred to repositioning flights as "deadleg," "deadhead," and "ferry" flights.  The designation "dead" refers to the lack of revenue generated when a customer does not pay to reposition the plane.

A related provision, section 2.7, provides in relevant part: "The aircraft charter rate shall be $5,000 per flight hour. Where [Pegasus] collects less than the hourly amounts stated above because of Air Traffic Control delays or other circumstances beyond its control, [Pegasus] shall remit the appropriate percentages to the Owner based upon the customers [*sic*] quoted price."

The parties dispute whether the phrase "per flight hour that aircraft is rented" in section 2.6 includes unpaid repositioning flights. Under the 2009 and 2010 leases, Pegasus did not include flight hours attributable to repositioning flights in its monthly statements to Transnational unless a customer paid for the flights, which occurred approximately 90 percent of the time. In May 2012 the parties negotiated new leases drafted by attorneys for Transnational. The new leases addressed the repositioning flight issue by defining the term "flight hour" to include "[a]ll hours or increments of an hour to reposition the Aircraft in connection with a flight on the Aircraft by any client and/or passenger of [Pegasus] ('Ferry Flight')." While those agreements were in effect, Pegasus agreed to pay Transnational for flight hours attributable to repositioning flights whether or not a customer paid for Pegasus to reposition the plane.

B.    *Transnational Terminates the Leases and Files This Action*

Several months after the parties signed the new leases in May 2012, Transnational terminated both leases and moved its planes to another charter operator. Transnational filed this action against Pegasus in August 2013. In its first cause of action (of the operative complaint) for breach of the 2009 and

6

2010 leases Transnational alleged Pegasus breached the original leases by failing to ensure the airworthiness of the planes, refusing to pay for all flight hours when the planes were rented and all associated fuel surcharges, failing to maintain and produce certain records, and overcharging for maintenance. In its second cause of action Transnational alleged similar breaches of the 2012 leases; the trial court subsequently granted Pegasus's motion for judgment on the second cause of action, and Transnational does not challenge that ruling. And in its third cause of action for an accounting Transnational claimed it needed an accounting of the revenue generated by the lease of its planes to Pegasus to determine the amount of damages Transnational suffered as a result of the alleged breaches of contract. Pegasus filed a cross-complaint against Transnational, Victor, and another company. The parties resolved the cross-complaint by agreeing Pegasus would receive a $69,000 offset in the final judgment.[4]

By the time trial began in December 2020 Transnational had focused its first cause of action for breach of contract on four categories of damages claims: (1) uncredited flight hours for unpaid repositioning flights; (2) additional uncredited and under-credited flight hours; (3) unpaid fuel surcharges; and

---

[4] Pegasus appealed from an earlier order denying in part its motion to disqualify counsel for Transnational or, in the alternative, to order Transnational and its attorneys to return certain allegedly confidential information they had obtained and to impose evidentiary sanctions. We dismissed part of Pegasus's appeal as moot and otherwise affirmed the trial court's order. (*Transnational Management Systems, LLC v. Pegasus Elite Aviation, Inc.* (Aug. 1, 2018, No. B277517) [nonpub. opn.].)

7

(4) unpaid federal excise tax (FET) rebates on fuel purchases. Regarding its claim for payments attributable to unpaid repositioning flights, Transnational argued section 2.6 of the 2009 and 2010 leases required Pegasus to pay Transnational for repositioning flights because the plain language of that provision covered all flight hours except those attributable to OTM flights. Transnational contended that Victor did not know Pegasus was making unpaid repositioning flights until Victor's deposition in this action, that Transnational (through Victor) would never have agreed Pegasus could withhold payments under section 2.6 for unpaid repositioning flights, and that the standard in the industry was to charge customers and credit owners for repositioning flights.

> C. *The Trial Court Agrees with Pegasus's Interpretation of Section 2.6 and Awards Transnational Damages for Certain Uncredited and Under-credited Flights, but Not for Unpaid Repositioning Flights*

The trial court, applying California law,[5] ruled the language of section 2.6 of the 2009 and 2010 leases was

---

[5] The 2009 and 2010 leases state they "shall be governed by and construed in accordance with the laws of the state of Arizona." In the trial court, however, the parties cited and relied on California law, as they do on appeal; neither party cites Arizona law or argues Arizona law applies. Like the trial court, we apply California law to interpret the leases. (See *Doe v. Massage Envy Franchising, LLC* (2022) 87 Cal.App.5th 23, 30, fn. 2 [court applied California law to determine whether there was a valid agreement to arbitrate, even though the agreement contained an Arizona choice-of-law provision, because the defendant analyzed the issue under California law]; *Brandwein v.*

ambiguous regarding whether "the parties intended that Pegasus would pay [Transnational] for every hour the plane flew other than OTM flights" and whether Pegasus would pay Transnational "for all flight hours including repositioning flights or whether Pegasus would only pay [Transnational] for those flight hours where they had a chartered customer paying for the hours." The court considered the parties' course of conduct before and after signing the leases, their contemporaneous communications, and industry custom and practice, and concluded the evidence supported Pegasus's position that section 2.6 did not require Pegasus to pay Transnational for unpaid repositioning flights. The trial court did not apply the maxim under Civil Code section 1654 that courts should resolve ambiguities against the party drafting the agreement because the court found the extrinsic evidence was sufficient to resolve the ambiguity. The court found both Victor and Prero had credibility issues and "were willing to distort the truth in order to advance their position in this litigation." Thus, in ascertaining the parties' intent and understanding of the leases, the court placed "great weight on the parties' contemporaneous actions and writing, and less on their testimony at trial." The court also

---

*Butler* (2013) 218 Cal.App.4th 1485, 1515 [court applied California law, even though the agreement stated New York law governed, because "neither the parties nor the trial court focused on New York law," and the parties cited only California law]; *Segal v. Silberstein* (2007) 156 Cal.App.4th 627, 632-633 [court applied California law, even though the agreements stated Texas law governed, because both parties relied on California law in the trial court and neither party argued Texas law applied on appeal].)

accepted the parts of the witnesses' testimony the court found true and disregarded parts the court found not true.

Regarding the FET rebates, the trial court found the leases were silent on which party was entitled to retain tax rebates. Relying on evidence of industry practice that supported Pegasus's position that charter operators generally retain tax rebates absent a contrary contract provision, and on "the speculative nature" of Transnational's claim for damages based on the FET rebates, the court found Transnational failed to establish it was entitled to the tax rebates.

Regarding unpaid flight hours, the parties stipulated during trial Pegasus did not pay Transnational for 475 hours, but 334.4 of those were for unpaid repositioning flights the trial court found not covered by section 2.6. Of the remaining approximately 140 hours, the court awarded Transnational $65,740 for 15.2 hours of flights Pegasus took for itself or its employees and $297,955.90 for 121.3 hours of additional uncredited flights. The court also awarded Transnational $282,782.48 for 59.3 hours of under-credited flight hours, $38,597.53 for double-billed fuel charges, and $808.77 for a charter to Tahiti. The court awarded Transnational total damages of $685,884.68 for unpaid or uncredited flight hours, subject to certain offsets.

Regarding fuel surcharges, the parties stipulated Pegasus paid Transnational for 376.8 flight hours without adding any fuel surcharge. Transnational alleged Pegasus owed a fuel surcharge of $500 to $750 per hour for each of those hours. The trial court declined to award Transnational damages for unpaid fuel surcharges because the court interpreted the leases to give Pegasus "absolute and unfettered" discretion to adjust the fuel

10

surcharge up or down, and Transnational failed to provide evidence the average fuel cost at the time of the flights in question was at or above the price set in the leases that would justify a fuel surcharge. The court also found Transnational's claim barred under the terms of the leases, which required the parties to raise billing issues within 20 days, and by laches. The court also rejected Transnational's claim for 13.3 flight hours attributable to a flight from Brazil to Van Nuys because Transnational did not substantiate its claim.

The trial court granted Pegasus $362,303.57 in offsets against the amounts Pegasus owed Transnational, based on evidence showing Pegasus over credited or double paid Transnational for multiple flights. Subtracting that amount from the total damages, the trial court awarded Transnational $323,581.11 ($685,884.68 - $362,303.57), less $69,000 for Pegasus's cross-complaint.

Regarding Transnational's cause of action for an accounting, the trial court ruled the 20-day trial "served as that accounting." The court found Transnational did not prove "the right to another one, nor would justice be served by requiring [the] parties to spend more time reviewing and arguing over the meaning of the flight logs and other accounting documents."

On September 10, 2021 the trial court entered judgment for Transnational in the amount of $254,581.11, denied Transnational's request for prejudgment interest, and left empty a blank space to add costs. On February 17, 2022 the court entered an amended judgment for Transnational of $186,691.21,

11

reflecting a net award of costs to Pegasus of $67,889.90. Transnational timely appealed.[6]

## DISCUSSION

Transnational argues the trial court erred in a variety of ways, including by finding section 2.6 of the 2009 and 2010 leases ambiguous and interpreting that provision to exclude unpaid repositioning flights from the flight hours Pegasus had to pay Transnational. Transnational also argues the court erred in ruling the leases allowed Pegasus to keep FET rebates, denying some of Transnational's damages claims, and denying Transnational's request for prejudgment interest.

---

[6]     Transnational filed its notice of appeal from the original judgment on November 22, 2021. We construe the notice of appeal to include an appeal from the amended judgment. (See *ECC Construction, Inc. v. Oak Park Calabasas Homeowners Assn.* (2004) 122 Cal.App.4th 994, 1003, fn. 5 [where an amended judgment changes only the amount of damages and does not "otherwise alter the bases for defendant's appeal," the reviewing court "may construe [the] notice of appeal to include the amended judgment"]; see also *Amwest Surety Ins. Co. v. Patriot Homes, Inc.* (2005) 135 Cal.App.4th 82, 84, fn. 1 [denying the defendant's request to dismiss an appeal where the plaintiff appealed from the judgment, but not the modified judgment, and the "modified judgment added only prejudgment interest, costs, and attorney fees to the original judgment, and made no substantive changes to the earlier judgment which finally disposed of all legal issues between the parties"].)

12

### A. *The Trial Court Properly Interpreted Section 2.6*

#### 1. *Applicable Law and Standard of Review*

"'The fundamental goal of contractual interpretation is to give effect to the mutual intention of the parties.' [Citations.] 'Such intent is to be inferred, if possible, solely from the written provisions of the contract.' [Citations.] 'If contractual language is clear and explicit, it governs.' [Citation.] '"The 'clear and explicit' meaning of these provisions, interpreted in their 'ordinary and popular sense,' unless 'used by the parties in a technical sense or a special meaning is given to them by usage' . . ., controls judicial interpretation."'" (*State of California v. Continental Ins. Co.* (2012) 55 Cal.4th 186, 195; see *Gilkyson v. Disney Enterprises, Inc.* (2021) 66 Cal.App.5th 900, 916.) The "'whole of [the] contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other.'" (*Gilkyson*, at p. 916; see *Brown v. Goldstein* (2019) 34 Cal.App.5th 418, 432.)

"'Where the meaning of the words used in a contract is disputed, the trial court must provisionally receive any proffered extrinsic evidence which is relevant to show whether the contract is reasonably susceptible of a particular meaning. . . . Even if a contract appears unambiguous on its face, a latent ambiguity may be exposed by extrinsic evidence which reveals more than one possible meaning to which the language of the contract is yet reasonably susceptible.'" (*Wolf v. Superior Court* (2004) 114 Cal.App.4th 1343, 1350-1351; see *Brown v. Goldstein, supra*, 34 Cal.App.5th at p. 438.) Thus, the "threshold question for trial and appellate courts is whether the writing is ambiguous—that is, reasonably susceptible to more than one interpretation."

(*Thompson v. Asimos* (2016) 6 Cal.App.5th 970, 986; see *State of California v. Continental Ins. Co., supra*, 55 Cal.4th at p. 195 [contract provision is ambiguous "'when it is capable of two or more constructions, both of which are reasonable'"].)  If a contract is capable of two constructions, "'courts must give a "'reasonable and commonsense interpretation'" of a contract consistent with the parties' apparent intent.'" (*Brown*, at p. 438.)  "In the trial court, and on appeal, contract interpretation always looks first to the words of the contract, but may also extend to parol evidence outside the four corners of the written agreement [citation], such as the parties' course of dealing over time."  (*Thompson*, at p. 986; see *Pacific Gas & Electric Co. v. G. W. Thomas Drayage etc. Co.* (1968) 69 Cal.2d 33, 40 [extrinsic evidence is admissible to prove the meaning of an ambiguous provision].)

"On appeal, a 'trial court's ruling on the threshold determination of "ambiguity" (i.e., whether the proffered evidence is relevant to prove a meaning to which the language is reasonably susceptible) is a question of law, not of fact. [Citation.]  Thus[,] the threshold determination of ambiguity is subject to independent review.'" (*Brown v. Goldstein, supra*, 34 Cal.App.5th at p. 433; see *Hollingsworth v. Heavy Transport, Inc.* (2021) 66 Cal.App.5th 1157, 1177 ["The superior court's determination whether the contractual language is ambiguous is a question of law subject to independent review."].)  "'[W]hen . . . ascertaining the intent of the parties at the time the contract was executed depends on the credibility of extrinsic evidence, that credibility determination and the interpretation of the contract are questions of fact . . . .'" (*Oakland-Alameda County Coliseum Authority v. Golden State Warriors, LLC* (2020) 53 Cal.App.5th 807, 819; see *City of Hope National Medical*

*Center v. Genentech, Inc.* (2008) 43 Cal.4th 375, 395.) Where "interpreting the contract involves deciding between 'conflicting extrinsic evidence concerning the meaning of . . . contractual provisions,'" the issue "is a factual question, not a legal one." (*Oakland-Alameda County Coliseum Authority*, at p. 819.) "[W]here the trial court's interpretation rests on its resolution of conflicting evidence, 'any reasonable construction will be upheld as long as it is supported by substantial evidence.'" (*Thompson v. Asimos*, *supra*, 6 Cal.App.5th at p. 987; see *Coral Farms, L.P. v. Mahony* (2021) 63 Cal.App.5th 719, 726; *Winet v. Price* (1992) 4 Cal.App.4th 1159, 1166.)

### 2. *Section 2.6 of the Leases Is Ambiguous*

Civil Code section 1638 provides that the "language of a contract is to govern its interpretation, if the language is clear and explicit,"[7] and section 1639 provides that when "a contract is reduced to writing, the intention of the parties is to be ascertained from the writing alone, if possible." However, "the meaning of words can change depending on the circumstances." (*Oakland-Alameda County Coliseum Authority v. Golden State Warriors, LLC*, *supra*, 53 Cal.App.5th at p. 817; see *Pacific Gas & Electric Co. v. G.W. Thomas Drayage etc. Co.*, *supra*, 69 Cal.2d at p. 38 [words "do not have absolute and constant referents"]; *Pearson v. State Social Welfare Bd.* (1960) 54 Cal.2d 184, 195 ["[a] word is a symbol of thought but has no arbitrary and fixed meaning like a symbol of algebra or chemistry, and it may take on values from the words and ideas with which it is associated"].)

As stated, section 2.6 of the 2009 and 2010 leases states Pegasus "shall pay Owner $5,000 per flight hour that aircraft is

---

[7]   Undesignated statutory references are to the Civil Code.

rented." The leases do not mention the term repositioning flights (or any of its synonyms), whether paid or unpaid by a charter customer. As the trial court pointed out, section 2.6 could mean, as Transnational argued, Pegasus had to pay Transnational for "every hour the plane was flying related to a chartered flight, including hours on the front or back end to reposition the plane even if the customer was not charged for those hours." But section 2.6 could also mean, as Pegasus argued, "Pegasus only had to pay [Transnational] for hours that the plane was actually rented," which would exclude unpaid repositioning flights. The language "per flight hour that aircraft is rented" is reasonably susceptible to both interpretations and therefore ambiguous regarding unpaid repositioning flights.

Transnational argues other provisions of the leases demonstrate section 2.6 is not ambiguous. First, Transnational argues section 2.7 shows that section 2.6's reference to "flight hour that aircraft is rented" means "actual flight hours," including hours attributable to an unpaid repositioning flight, and not "quoted flight hours" to a customer. As discussed, section 2.7 states: "Where [Pegasus] collects less than the hourly amount stated above because of Air Traffic Control delays or other circumstances beyond its control, [Pegasus] shall remit the appropriate percentages to [Transnational] based upon the customers [*sic*] quoted price." Transnational argues that, "[b]y indicating that the 'hourly amounts stated above' are different than the hourly amounts based on the 'quoted price,' [section] 2.7 confirms that [section] 2.6 refers to actual flight hours rather than quoted flight hours."

Transnational's argument is not persuasive. Pegasus did not argue, and the trial court did not find, the language "flight

16

hour that aircraft is rented" in section 2.6 means the flight hours quoted to a customer. Indeed, Transnational did not challenge Pegasus's practice of inflating the hours quoted to a customer, and then paying Transnational based on actual flight hours, not quoted flight hours. Moreover, Transnational's argument does not resolve the ambiguity in section 2.6. That section 2.7 allows Pegasus to pay Transnational less than $5,000 per flight hour (as otherwise required by section 2.6), when the amount Pegasus collects from a customer equates to less than $5,000 per flight hour because of air traffic delays or circumstances beyond Pegasus's control, has no effect on unpaid repositioning flights.

Second, Transnational argues section 2.7 creates an exception to section 2.6 for air traffic control delays and other circumstances beyond Pegasus's control, but because nothing in the contract creates a similar exception for unpaid repositioning flights, section 2.6 could not have created one. The leases' silence on the issue of unpaid repositioning flights, however, also fails to resolve the ambiguity of section 2.6. (See *Smith v. Westland Life Ins. Co.* (1975) 15 Cal.3d 111, 120 [a contract's silence regarding a material term cast "a shroud of ambiguity" over the contract, making the contract susceptible to multiple interpretations].) Moreover, Transnational had previously argued that, because the leases are also (mostly) silent on Pegasus's 13.5 percent commission, Transnational did not owe Pegasus a commission. Transnational, however, no longer disputes that the agreements allowed Pegasus to deduct a commission from its payments to Transnational, and Victor conceded at trial that he negotiated the commission with Prero.

Third, Transnational argues the proposed operating budget attached to the leases "vitiates any 'unpaid ferry flight'

17

exception." Transnational accurately observes that the proposed budget refers to only four types of flights—charter, owner, training, and maintenance—and does not refer to paid or unpaid repositioning flights. From this, Transnational concludes that under the proposed budget "all usage of [a plane] that is not OTM usage is Charter usage" and that therefore Transnational must be "compensated for every hour of Charter usage at the [section] 2.6 hourly rate." But, as the trial court found, the "proposed" operating budget was, by its terms, only a proposal, and several line items in the proposed budget (even for the lease of the 772 plane, which post-dated the lease for the 771 plane by six months) do not include estimates, presumably because the proposed budget was incomplete.[8] These blank line items include material categories, such as the number of training and maintenance hours. As an incomplete proposal, the proposed budget does not resolve the ambiguity of section 2.6.

### 3. *Substantial Evidence Supported the Trial Court's Interpretation of Section 2.6*

Because section 2.6 of the leases is reasonably susceptible to the parties' competing interpretations, the trial court properly found it was ambiguous and considered extrinsic evidence to discern the parties' intent. (See *Hewlett-Packard Co. v. Oracle Corp.* (2021) 65 Cal.App.5th 506, 538 ["courts may consider

---

[8] The trial court also found Transnational could not have relied on the proposed budget as a basis for the parties' economic expectations because Victor testified he did not see the proposed budget before signing the 2009 lease and called the document attached to the lease as an appendix a "'fraudulent document'" and "'a forgery.'" Transnational does not challenge this finding.

18

extrinsic evidence insofar as it sheds light on a meaning to which the contract is reasonably susceptible"]; *Oakland-Alameda County Coliseum Authority v. Golden State Warriors, LLC, supra,* 53 Cal.App.5th at p. 818 [same].)  "The circumstances surrounding and leading to the execution of a contract may be considered to ascertain its true meaning." (*Kashmiri v. Regents of University of California* (2007) 156 Cal.App.4th 809, 838; see *Nish Noroian Farms v. Agricultural Labor Relations Bd.* (1984) 35 Cal.3d 726, 735 ["[t]he factual context in which an agreement was reached is . . . relevant to establish its meaning unless the words themselves are susceptible to only one interpretation"]; see also § 1647 ["[a] contract may be explained by reference to the circumstances under which it was made, and the matter to which it relates"].)

In addition, a "party's conduct occurring between execution of the contract and a dispute about the meaning of the contract's terms may reveal what the parties understood and intended those terms to mean." (*City of Hope National Medical Center v. Genentech, Inc., supra,* 43 Cal.4th at p. 393.)  "It is a time-honored principle that the conduct of the parties is given great weight in the interpretation of a contract. . . .  'This rule of practical construction is predicated on the common sense concept that "actions speak louder than words."  Words are frequently but an imperfect medium to convey thought and intention.  When the parties to a contract perform under it and demonstrate by their conduct that they knew what they were talking about the courts should enforce that intent.'" (*Travelers Property Casualty Co. of America v. Workers' Comp. Appeals Bd.* (2019) 40 Cal.App.5th 728, 739-740; see *Cedars-Sinai Medical Center v. Shewry* (2006) 137 Cal.App.4th 964, 983 [conduct of the parties is a practical

19

construction of the contract because the parties "'are probably least likely to be mistaken as to the intent'"].) Finally, courts may consider evidence of industry custom or practice to prove an interpretation to which an agreement is reasonably susceptible. (See *Wolf v. Superior Court, supra*, 114 Cal.App.4th at p. 1357; *Southern Pacific Transportation Co. v. Santa Fe Pacific Pipelines, Inc.* (1999) 74 Cal.App.4th 1232, 1244-1245.)

The trial court considered and made credibility determinations and findings based on four categories of conflicting extrinsic evidence: (1) the parties' interactions prior to entering into the 2009 lease, (2) the drafting and negotiating of the 2009 lease, (3) the parties' conduct after entering into the 2009 lease (including entering into the 2010 and 2012 leases), and (4) evidence of custom and practice in the industry. Together, this evidence supported the trial court's reasonable conclusion that the parties intended section 2.6 to exclude unpaid repositioning flights from "flight hour[s] that aircraft is rented."

a. *The Parties' Interactions Before Entering into the 2009 Lease*

As stated, Prero and Victor met when Victor chartered planes from Prero's previous employers, Pacific Jet and Universal. Victor testified that, as a customer of Pacific Jet and Universal, he received price quotes for proposed flights showing the number of hours for the flight and whether the operator had to reposition the plane before his charter. Victor stated the cost of repositioning the plane for his charter was "part of [his] bill." Victor said he had conversations with Prero about the cost of repositioning flights while Prero flew planes chartered by Victor. According to Victor, these conversations went something like this:

20

Victor:  "'Why is there an extra price to fly over there?'" Prero: "'Well, because we have to basically relocate the plane.'"  Victor: "'Oh, okay.'"

Victor testified that he chartered planes from Pacific Jet more than 12 times and that he paid for repositioning flights for about half those charters.  He said he flew more frequently with Universal, and similarly paid for repositioning flights on half of those charters.  For each charter where he paid for a repositioning flight, Victor stated, the flight was listed on the itinerary he received from the charter company.[9]  Prero disputed Victor's testimony and said he did not believe Pacific Jet or Universal ever charged Victor for a repositioning flight.

Victor further testified that, before entering into the 2009 lease with Pegasus, he understood there were no one-way charters, which meant that, if a customer wanted to fly one-way, the customer had to pay for a roundtrip flight.  Victor also testified, however, that when Pacific Jet or Universal quoted a charge for a repositioning flight, he would attempt to "negotiate a side deal" with Prero as the pilot or try to find another charter at a lower price.  And Victor testified that, when he was a customer of Pacific Jet and Universal, he asked Prero "detailed questions" about "ferry legs," such as:  "How do we always basically make sure this happens, that happens.  I wanted to understand the questions, what happens if the plane has to be relocated.  And he says, 'Adam, the client always pays for that.'"  At a minimum, Victor's experience as a charter customer before Transnational entered into the leases with Pegasus showed Victor was aware

---

[9]     Victor said he did not have copies of itineraries for those flights, which occurred over 15 years ago.

21

that repositioning flights occurred and that customers generally, but not always, paid for them.

b.     *Drafting and Negotiating the 2009 Lease*

Prero testified he negotiated the initial lease with Victor's attorney and Carcione, both of whom represented Victor in the transaction.  Prero said he understood Victor wanted to "make as much money as possible" by flying the plane as often as possible.  Prero testified that repositioning flights were necessary to maximize income and that Victor told him to use his judgment in deciding whether to make unpaid repositioning flights to maximize the number of paid flights.  Thus, according to Prero, the phrase "is rented" in section 2.6 was intended to mean Pegasus would pay Transnational only if "someone was paying for that hour."  Otherwise, Prero stated, the phrase would be superfluous, and he would have to pay Transnational for every hour the plane flew, whether or not someone paid for the flight.  The trial court agreed the language of section 2.6 conformed with Prero's understanding.

Victor testified that, before he entered into the 2009 lease, he did not know there was "such a thing as an unpaid [repositioning] flight" and that he would not have entered into an agreement that allowed Pegasus not to charge a customer for a repositioning leg without notice to Transnational.  Victor said he understood section 2.6 meant Transnational would be paid for "every hour the plane is flying," except for OTM flights.  He said he would not have approved an unlimited number of unpaid repositioning legs because of the wear and tear on the planes without any corresponding revenue.

The trial court did not credit Victor's testimony for various reasons, including that, as a previous consumer of charter flights, Victor conceded he could negotiate a deal not to pay for a repositioning flight. The court also found Victor gave testimony and took positions in other cases that contradicted his testimony and positions in this case, which the court said showed Victor's "willingness to present false testimony under oath."

Transnational argues "the lack of any pre-Lease writing by Victor mentioning [unpaid repositioning flights] is inexplicable unless it was concealed from him." Transnational also cites evidence of Prero's attempts to conceal other information from Victor. But Transnational did not allege a fraud cause of action, and "courts assume that each party to a contract is alert to, and able to protect, his or her own best interests." (*Series AGI West Linn of Appian Group Investors DE, LLC v. Eves* (2013) 217 Cal.App.4th 156, 164.) Courts "will not rewrite contracts to relieve parties from bad deals nor make better deals for parties than they negotiated for themselves." (*Ibid.*; see *Coral Farms, L.P. v. Mahony, supra*, 63 Cal.App.5th at p. 731 [""The courts cannot make better agreements for parties than they themselves have been satisfied to enter into or rewrite contracts because they operate harshly or inequitably. It is not enough to say that . . . the contract would be improvident or unwise or would operate unjustly. Parties have the right to make such agreements.""].)

Transnational contends the trial court failed to explain how Victor could have entered into an unfavorable contract if, as the court found, he was "a 'sophisticated' Wharton graduate."[10] The

---

[10] The Wharton School of Business is a graduate business school operated by the University of Pennsylvania. (*University of Pennsylvania v. E.E.O.C.* (1990) 493 U.S. 182, 185.)

explanation is in the record. As the court observed, Victor admitted "he did no due diligence" before buying the 771 plane or the 772 plane and did not know who the seller of the 771 plane was, even though the seller's name was listed "front and center" on the purchase agreement. The court also suggested Transnational overpaid for the planes, stating Victor paid $1 million more for the 771 plane than the previous owner had paid just days before. The court also cited Victor's testimony that he never saw the proposed budget before signing the 2009 lease and that he "never looked at any of the maintenance records and he only glanced at the credit memo[s]." Victor also testified he was not sure if he read the 2010 lease before he signed it. Together, this evidence suggested that Victor, despite his sophistication, took little interest in the details of Transnational's charter plane business. Thus, it was not irrational, as Transnational suggests, for the trial court to conclude Victor committed Transnational to an unfavorable deal with Pegasus.[11]

> c. *The Course of the Parties' Conduct After Entering into the 2009 Lease*

Evidence of the parties' conduct under the two initial leases centered on email threads from April 2010 that implicitly referred to repositioning flights, credit memos generated after July 2010 that showed the origin and destination of paid charter flights, and the negotiation and terms of the new leases signed in

---

[11] Unpersuasive for the same reasons is Transnational's argument it is "inherently implausible" Transnational would have agreed to a lease that allowed Pegasus to "'have it both ways' by compensating [Transnational] based on quoted flight hours or actual hours depending on which benefits [Pegasus]."

2012.  Prero testified most charter flights were booked through brokers based on quotes Prero or his staff generated to estimate flight times.  A signed quote constituted an agreement for services and obligated Pegasus to position the plane at the customer's place of origin.  Under Prero's understanding of the leases, Pegasus paid Transnational based on actual fight hours the plane was "rented."  If Pegasus quoted a customer more flight hours than the actual flying time, Pegasus kept the overage and paid Transnational based on actual flight hours.  If the flight lasted longer than quoted, Pegasus generally did not charge the customer more and still paid Transnational based on actual flight hours (unless the additional hours were the result of air traffic control delays or other circumstances beyond Pegasus's control, as stated in section 2.7).  Prero said that he generally tried to get customers to pay for repositioning flights and that they did about 90 percent of the time.

Pegasus introduced into evidence two April 2010 email threads to show Victor was aware Pegasus made unpaid repositioning flights during the performance of the initial leases. The first thread began with Victor asking Prero if the 771 plane was available to bring a friend of Victor's from Switzerland to the United States.  Victor said that he could only charge his friend "fuel + a bit" and that it would only "make[ ] sense if you are flying someone over there and don't have a body to come back this way."  Victor stated in another message in the same thread, "But if you have an empty plane coming back from Europe . . . you have a tenant that could pay fuel + a little."  The trial court concluded this email thread showed that Victor "was aware that sometimes his planes flew empty, and that he would not receive revenue for those empty legs; otherwise, if he knew he

would be paid $5000 per hour for this return flight regardless of whether it was paid for by a charter customer, why would he care if his [friend] got a free ride back to the United States?"

The second email thread concerned a possible flight from New York to Los Angeles for Victor's son. Prero told Victor the plane was not available on the requested date because it was scheduled to fly to Europe. In response, Victor asked, "How many hours do we get for an LA/Europe trip?" and "Do we get paid both ways?" The trial court said this message supported Pegasus's position Victor "knew he would not always be paid round trip for every charter flight." In May 2010, after those email exchanges, Transnational and Pegasus entered into the lease for the 772 plane. Victor did not request any changes to the terms of the lease for the 771 plane.

Transnational argues the email threads "merely reflect that Victor knew [Pegasus] could either fly a customer one-way with round-trip payment or get paid on return by linking one-way charters." Transnational contends the inference the court should have drawn from the first email is that Victor did not want to preempt Prero from finding a paying customer for the return flight to the United States to help a friend of the family. The trial court very well could have drawn that inference. But it didn't, and on appeal ""we 'view the evidence in the light most favorable to the prevailing party, giving it the benefit of every reasonable inference and resolving all conflicts in its favor.'"" (*Reynaud v. Technicolor Creative Services USA, Inc.* (2020) 46 Cal.App.5th 1007, 1015; see *Duncan v. Kihagi* (2021) 68 Cal.App.5th 519, 541.) Regarding the second email, Transnational suggests that Victor's question whether "we get paid both ways" meant whether the charter customer paid for a

26

round-trip even though the customer flew only one-way or whether Prero was going to wait in Europe for a return flight and collect "'standing fees'" (presumably from the original customer). Transnational's suggestion, however, does not show the trial court's inference was unreasonable.[12]

Pegasus also introduced credit memos issued to Transnational after July 2010, when Victor asked that the credit memos identify the airports involved in each listed charter flight. According to Prero, Victor wanted those details so he could see "'where the aircraft went and what it's being paid for.'" For example, a credit memo dated June 30, 2011 listed eight charter flights and the airports of origin and destination for each. The second flight listed was from "TEB" to "EGGW," which was from Teterboro, New Jersey, to an airport in England on June 7-8, 2011. The next flight listed, on June 13, 2011, is from "LIML" to "CYYZ," which was from Milan to Toronto, with no charter flight in between showing a customer paid for the plane to get from England to Milan. The trial court stated: "The plane . . . couldn't have walked from England to Milan; it flew. And it's not accounted for on the credit memo. . . . And anyone looking at [the credit memo] who paid any attention would know that." Pegasus introduced other credit memos showing similar geographic gaps between the destination airport from one charter flight and the originating airport for the next, which indicated a repositioning

---

[12] Many of Transnational's remaining arguments regarding the extrinsic evidence relating to the interpretation of section 2.6 attempt to reargue and reweigh that evidence. Again, that is something appellate courts cannot do. (*Schmidt v. Superior Court* (2020) 44 Cal.App.5th 570, 582; *Pope v. Babick* (2014) 229 Cal.App.4th 1238, 1245.)

27

flight in between. Based on the credit memos, the trial court found "any reasonably intelligent person (and Mr. Victor far exceeds that low bar), looking at the credit memos starting in July 2010 would have seen that the plane was being moved without revenue being paid to [Transnational]."

Transnational argues the trial court wrongly concluded the credit memos showed Transnational was not credited for unpaid repositioning flights. Transnational points to a July 31, 2010 credit memo showing a credited trip from Madrid to Van Nuys on July 15, 2010, and the next credited trip from Teterboro to Switzerland on July 24, which the trial court suggested must indicate an unpaid repositioning trip in between. Flight logs produced by Pegasus, however, showed that a customer who flew from Teterboro to Madrid on July 14 paid for a return flight to Teterboro on July 18, thus (re)positioning the plane to fly out of Teterboro again on July 24.

To be sure, as Transnational argues, the credit memos do not, as the trial court suggested, necessarily reveal unpaid repositioning flights. This is in part because it was unclear how Pegasus billed customers who paid for a repositioning flight and how those flights appeared on the credit memos. For example, did Pegasus list the destination airport for the previous charter as the airport of origin when a customer paid for a repositioning flight? Or did Pegasus simply add the flight hours attributable to the repositioning flight to those listed for the customer's flight from his or her airport of origin to the desired destination? Prero testified customers paid for repositioning flights 90 percent of the time, but the credit memos submitted into evidence from July 2010 through April 2012 show geographic gaps in roughly 50 percent of the listed flights.

28

At a minimum, however, the credit memos suggested movements of planes without an easily identifiable corresponding payment to Transnational.  The trial court found Victor would have seen from the credit memos "that [a] plane was being repositioned between cities without [Transnational] receiving payment."  That Victor asked in July 2010 for the credit memos to indicate the airports of origin and destination made more reasonable the trial court's inference Victor should have known Pegasus might be moving planes without payment to Transnational.  In addition, Prero testified Victor asked him by email in "a couple instances" if "both legs [of a flight listed on a credit memo] were paid round trip," and Prero said, "It's on the credit memo–what's paid, from where to where."

By April 2012 Victor had requested an audit of the accounts for the planes leased to Pegasus.  Victor testified the purpose of the audit was to ensure he "was getting what [he] was entitled to get."  The auditing firm Victor hired was unable to obtain all the documentation required to prepare a detailed report, and Victor chose not to proceed with the audit because the auditing firm told him it "was going to be a very expensive, long, drawn-out audit."

Despite the concerns Victor may have had leading up to the audit, Transnational entered into new leases with Pegasus in May 2012.  Carcione and an attorney representing Victor drafted the new leases, which differed from the 2009 and 2010 agreements in several material respects.  First, the 2012 leases defined the term "flight hour" to include "[a]ll hours or increments of an hour to reposition the Aircraft in connection with a flight on the Aircraft by any client and/or passenger of [Pegasus] ('Ferry Flight')."  The agreements also reduced the hourly rate Pegasus paid Transnational to $2,500 per standard

29

flight hour and $1,500 per hour for all "Ferry Flights." Finally, the 2012 agreements eliminated Pegasus's commission and required Pegasus to pay all fuel costs. Prero testified that Carcione presented the new agreements to him as Victor's "idea" and that he (Prero) agreed to the new terms because they were more profitable for Pegasus. The court found the 2012 leases supported Pegasus's argument Victor "was well aware of the issue of unpaid flights from the inception of the parties' relationship. . . . [H]is decision to request payment for those flights is an acknowledgment that he was not getting paid for them under the prior agreements." Which is exactly what it was.

Transnational argues the trial court erred in concluding Victor included the new provision in the 2012 leases regarding unpaid repositioning flights. Transnational's argument, however, is based on testimony by Victor the court discredited and on contradictory statements from Prero regarding the advantages of the new agreements for Pegasus. As discussed, we do not reweigh evidence or reassess the credibility of witnesses. (*Reynaud v. Technicolor Creative Services USA, Inc.*, *supra*, 46 Cal.App.5th at p. 1015.) Moreover, it doesn't matter which party added the new provisions to the 2009 and 2010 leases: The provision in the 2012 agreements defining flight hours to include unpaid repositioning flights supported the trial court's finding Victor knew the 2009 and 2010 agreements did not entitle Transnational to payment for such flights.

d.    *Custom and Practice in the Industry*

The court found evidence of custom and practice in the industry of "limited application" because only Prero had experience in the charter industry before Pegasus entered into

30

the leases with Transnational. But because Victor received advice from people with experience in the industry, the court found "general industry practices [had] some relevance to the advice he was being given about terms to include and terms to avoid." Both parties offered expert testimony. Ultimately, the court found the testimony a "mixed bag," but concluded Pegasus's interpretation of section 2.6 was "in line with industry standards" because the various experts did not contradict Prero's belief that repositioning flights were not included in the "flight hours" to be paid to Transnational.

The court based its finding on expert testimony "that owners and operators could expressly address repositioning flights or not; and that there was no fixed practice as to whether the owner was *always* paid for repositioning flights." This evidence included testimony by Charles Odell, an expert who testified on behalf of Pegasus, and by Prero. Odell testified that whether a repositioning flight is part of a charter flight (also referred to as a "revenue-generating flight") is determined by the agreement with the customer, which sometimes occurs weeks or months in advance and generally requires the charter operator to have the plane in the customer's departure city on a particular date. He also testified there was no industry standard on payments from charter operators to owners for unpaid repositioning flights. Prero testified there is no standard contract language in the industry requiring a charter operator to pay an owner for unpaid repositioning flights; instead, he said, each lease is individually negotiated and reflects the terms agreed on by the operator and the owner. That practice is reflected in the nine different leases Pegasus had for the 15 planes it operated, at least one of which required Pegasus to pay for every flight hour,

31

including unpaid repositioning flights, while several others excluded unpaid repositioning flights from flight hours that required payment from Pegasus to the owner.

Transnational generally disagrees with the testimony of Odell and Prero and argues its experts offered "compelling evidence" in its favor. In particular, Transnational argues its expert, William Quinn, testified that the 2009 and 2010 leases were "flat-rate" contracts and that the industry standard for such contracts is "all flight hours other than OTM should generate owner revenue." Quinn's testimony, however, did not foreclose the possibility an owner and operator could come to a different agreement. For example, Quinn testified a flat-rate lease generally does not include a commission for the operator either, but the 2009 and 2010 leases did. More fundamentally, Transnational's argument again impermissibly asks us to reweigh the evidence by crediting the testimony from Transnational's experts over Pegasus's. In a court trial, however, "the trial court is the 'sole judge' of witness credibility." (*Schmidt v. Superior Court* (2020) 44 Cal.App.5th 570, 582; see *DiPirro v. Bondo Corp.* (2007) 153 Cal.App.4th 150, 195 [reviewing court does not reweigh the testimony of expert witnesses].) "The testimony of witnesses who were apparently believed by the trier of fact may be rejected on appeal only if that testimony was physically impossible of belief or inherently improbable without resort to inferences or deductions." (*DiPirro*, at p. 195.) The testimony of Pegasus's expert witnesses credited by the trial court was not "so inherently lacking in credibility as to be unworthy of consideration." (*Ibid*.)

Transnational also argues Odell's testimony "was so inconsistent with other evidence in the case that it virtually

32

disqualified him as an expert." But the court found Odell was qualified to testify as an expert in the charter aircraft industry based on his experience as a charter pilot, an officer of a charter operator, a member of the Board of Governors for Air Charter Safety Foundation, an owner of a company that manages planes for individual ownership groups, an active member of professional associations for charter plane operators, and his experience negotiating between 40 to 50 leases with owners. That's a lot of qualification. And Transnational did not object that Odell lacked foundation to testify as an expert.

### 4. *The Trial Court's Interpretation Is Reasonable*

Transnational's remaining arguments concerning section 2.6 essentially contend the trial court's interpretation of that provision is not reasonable in light of certain extrinsic evidence. For example, Transnational argues the trial court's interpretation of section 2.6 was unreasonable because Prero testified the price Pegasus charged its customers did not have "any bearing as to what Pegasus [had] to pay to [Transnational] . . . under section 2.6." Transnational interprets Prero's testimony to mean Pegasus's pricing had no bearing on "owner revenue" except as set forth in section 2.7, thus suggesting Prero conceded an unpaid repositioning flight did not impact what Pegasus owed Transnational. Transnational reads too much into Prero's ambiguous testimony. Prero's testimony also could have meant, and likely did mean, the amount Pegasus charged a customer per hour did not affect the amount Pegasus paid to Transnational per flight hour under section 2.6.

Transnational makes a similar argument about Prero's testimony that section 2.6 does not concern "revenues paid to

Pegasus" from its customers.  Transnational suggests this statement shows Prero interpreted section 2.6 to require Pegasus to pay Transnational per flight hour regardless of whether a customer paid Pegasus for a repositioning flight.  But the question Prero was asked was whether section 2.6 "say[s] anything about revenues paid to Pegasus . . . from your customers," and Prero said, "No."  Again, Prero's testimony likely meant, and the trial court could reasonably conclude it meant, Pegasus paid Transnational $5,000 per flight hour a plane was rented, regardless of the amount per hour the customer paid Pegasus.

Transnational builds on Prero's testimony to argue an interpretation of section 2.6 that requires Pegasus to pay the $5,000 per flight hour to Transnational regardless of any discount on the hourly rate paid by the customer, but allows Pegasus to pay Transnational nothing for discounting the number of hours a customer pays for, is inherently contradictory. But Prero testified he did not consider unpaid repositioning flights to be a discount offered to an otherwise paying customer or even within the scope of a customer's rental agreement.  This interpretation is entirely consistent with the business plan Prero said he pursued under the 2009 and 2010 leases to maximize profit by "pioneering" one-way charters, which necessitated occasional unpaid repositioning flights.  The evidence of that business plan, which the trial court credited, is consistent with the trial court's interpretation of section 2.6.

Transnational next argues the trial court's interpretation of the word "rented" in section 2.6's reference to "per flight hour that aircraft is rented" contradicted extrinsic evidence of Pegasus's business practices.  Transnational points to the trial

34

court's observation in its statement of decision that Prero "conceded that if a plane had to be flown to Los Angeles for a charter trip departing from there, the reason it was flying the leg to Los Angeles was 'because [the plane] had been rented.'" According to Transnational, this must mean the plane was "rented" within the meaning of section 2.6. But section 2.6 does not say "per flight hour *because* that aircraft is rented" or "per flight hour *related to* that aircraft being rented." The trial court's interpretation of the language "is rented" to mean within the scope of a customer's rental agreement does not contradict Pegasus's business practices. Nor, contrary to Transnational's assertion, is the trial court's interpretation of section 2.6 "strained" because, according to Transnational, "if there is a customer, the Plane 'is rented.'" Indeed, Prero provided the example of a customer renting a plane several months in advance to fly from Los Angeles to Europe. If the plane was out of position as a result of an owner flight, for example, Pegasus could not "break" the existing contract with the customer and demand the customer pay for the plane to be repositioned to Los Angeles; the repositioning flight was not part of the customer's rental agreement.

5. *The Trial Court Did Not Err in Not Construing Section 2.6 Against Pegasus as Drafter*

Transnational argues that, even if the trial court's interpretation of section 2.6 is reasonable and supported by substantial evidence, the court erred by not interpreting the ambiguity regarding unpaid repositioning flights against Pegasus as the drafter. Under section 1654, "[i]n the event other rules of interpretation do not resolve an apparent ambiguity or

35

uncertainty, 'the language of a contract should be interpreted most strongly against the party who caused the uncertainty to exist.'" (*ASP Properties Group, L.P. v. Fard, Inc.* (2005) 133 Cal.App.4th 1257, 1269; accord, *Oakland-Alameda County Coliseum Authority v. Golden State Warriors, LLC*, *supra*, 53 Cal.App.5th at p. 822.) As the trial court recognized, this rule applies only "where the extrinsic evidence is either lacking or is insufficient to resolve what the parties intended the terms of the contract to mean . . . ." (*Oakland-Alameda County Coliseum Authority*, at p. 823.) Because the court found the extrinsic evidence sufficient to determine the parties' intent, and because substantial evidence supported the court's findings, the rule codified in section 1654 did not apply.

### B.   *The Trial Court Did Not Err in Failing To Apply an Adverse Inference Regarding Certain Damages*

Transnational argues Pegasus "willfully conceal[ed]" evidence of customer payments for repositioning flights that Pegasus claimed were unpaid. As a result, Transnational contends, the trial court should have applied an adverse inference against Pegasus and should not have excluded from Transnational's damages flight hours Pegasus claimed were attributable to unpaid repositioning flights without a customer invoice backing up that claim. Transnational's argument lacks factual support.

Evidence Code section 413 allows the trier of fact to consider a party's "willful suppression of evidence" in deciding "what inferences to draw from the evidence or facts in the case against a party." "[W]illful suppression" occurs when a party destroys evidence with the intention of preventing its use in

36

litigation (*Bader v. Johnson & Johnson* (2022) 86 Cal.App.5th 1094, 1129) or fails to produce any evidence on a matter solely within that party's knowledge (*Takiguchi v. Venetian Condominiums Maintenance Corp.* (2023) 90 Cal.App.5th 880, 895; *Westinghouse Credit Corp. v. Wolfer* (1970) 10 Cal.App.3d 63, 69). For example, in the case cited by Transnational, *Breland v. Traylor Engineering & Manufacturing Co.* (1942) 52 Cal.App.2d 415, the trial court applied the adverse inference against a party who "failed to produce any evidence" the party "must have possessed" on the relevant issue. (*Id.* at pp. 425-426.) Here, Transnational asserts, Pegasus "willfully withheld from discovery all payment information including customer quotes and invoices." But Pegasus produced over 400 pages of customer invoices, and in arguing Pegasus willfully suppressed relevant evidence, Transnational points only to documents where Pegasus conceded it did not have customer invoices for every flight and therefore could not produce the documents. Not surprisingly, the trial court made no finding that Pegasus willfully suppressed any evidence, and Transnational does not contend that was error.

> C. *Transnational Has Not Shown the Trial Court Erred in Denying Transnational's Claim for FET Rebates*

Transnational argues its expert witness's testimony regarding industry custom and practice relating to FET rebates "was more credible and reasonable" than the testimony of Prero and Pegasus's expert witness. Even if we accepted Transnational's implied and unsubstantiated argument that substantial evidence did not support the trial court's findings regarding industry custom and practice, the trial court also found Transnational's claim for damages based on unremitted FET

37

rebates was "speculative." Transnational does not address this aspect of the trial court's ruling. No reversible error here.

D. *Transnational Has Not Shown Its Damages Evidence Compels a Finding in Its Favor*

Transnational argues the trial court miscalculated certain damages owed to Transnational. Transnational, of course, had the burden of proving the nature and amount of its damages. (See *Atkins v. City of Los Angeles* (2017) 8 Cal.App.5th 696, 738; *Sonic Manufacturing Technologies, Inc. v. AAE Systems, Inc.* (2011) 196 Cal.App.4th 456, 464). "'[W]here the issue on appeal turns on a failure of proof at trial, the question for a reviewing court becomes whether the evidence compels a finding in favor of the appellant as a matter of law. [Citations.] Specifically, the question becomes whether the appellant's evidence was (1) "uncontradicted and unimpeached" and (2) "of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding."'" (*Sonic Manufacturing*, at p. 466; accord, *Lincoln v. Lopez* (2022) 77 Cal.App.5th 922, 929.) This is "a heavy, perhaps insurmountable, burden on appeal," one Transnational has not met. (*Lincoln*, at p. 929; see *Fabian v. Renovate America, Inc.* (2019) 42 Cal.App.5th 1062, 1067 [where "the judgment is against the party who has the burden of proof, it is almost impossible for him to prevail on appeal by arguing the evidence compels a judgment in his favor" because "we presume the trial court found the [party's] evidence lacks sufficient weight and credibility to carry the burden of proof"].)

38

### 1. *Unpaid Repositioning Flights*

The parties stipulated that the total flight hours flown for which Pegasus did not pay Transnational (excluding OTM flights) was 475 hours. The trial court credited evidence from Pegasus that 334.4 hours of those 475 hours were attributable to unpaid repositioning flights. The court stated: "Victor's testimony about the number, destination, and related expenses of the flight hours he thought were 'missing' was not based on personal knowledge or expert testimony, and was highly speculative." Thus, the court rejected Transnational's claim Pegasus owed Transnational for some portion of the 334.4 hours attributable to unpaid repositioning flights.

Transnational contends the trial court should have rejected Pegasus's evidence because the court's interpretation of section 2.6 allowed Pegasus "to cheat [Transnational] by reclassifying a paid repositioning leg as a separate unpaid repositioning / [Pegasus] trip—or by taking payment for repositioning in 'fees' instead of hours." In short, Transnational asserts at least some of the unpaid repositioning trips were "bogus." But the trial court credited Pegasus's evidence regarding the 334.4 hours of unpaid repositioning flights, and Transnational has not shown its evidence (which the court deemed "highly speculative" and "based solely on conjecture and coincidence") was uncontradicted and unimpeached. (See *Sonic Manufacturing Technologies, Inc. v. AAE Systems, Inc.*, *supra*, 196 Cal.App.4th at p. 466.) Instead, Transnational merely rehashes the evidence. (See *Paterno v. State of California* (1999) 74 Cal.App.4th 68, 102 [plaintiff's attack on the defendants' evidence at trial was "no more than a rehash of arguments about the strength of the evidence, which is not open on appeal"];

39

*MacGregor Yacht Corp. v. State Comp. Ins. Fund* (1998) 63 Cal.App.4th 448, 458 [defendant's improper "attempts to rehash conflicts in the evidence" ignored "the well[-]established principle that an appellate court may not reweigh the evidence or determine the credibility of witnesses where the evidence at trial was in conflict"].) Transnational also argues the trial court failed to address certain of its challenges to Pegasus's "claimed unpaid ferry flights," but the court in its statement of decision found Pegasus substantiated its claim that 334.4 hours were for unpaid repositioning flights.

### 2.    *Alleged Credit Memo Errors Regarding Fuel Surcharges*

As discussed, the 2009 and 2010 leases required Pegasus to pay Transnational a fuel surcharge of $500 per flight hour based on the then-average price of $3.75 per gallon. The trial court ruled the leases gave Pegasus the "absolute and unfettered" discretion to increase or decrease the fuel surcharge, a ruling Transnational does not challenge. Pegasus disclosed the fuel surcharge, if any, for each flight on the credit memos Pegasus sent to Transnational and, as stated, Pegasus stipulated there were 376.8 flight hours for which it did not pay Transnational a fuel surcharge.

The trial court denied this claim for two reasons. First, the court ruled Transnational did not present evidence to counter Prero's testimony Pegasus did not pay a fuel surcharge for the disputed hours because "the average fuel cost was below the $3.75 a gallon referenced in the agreements." Second, the court ruled laches barred Transnational from recovering damages for unpaid fuel surcharges because Transnational failed to challenge

40

the relevant credit memos within the 20 days prescribed by the leases.  In response to the first ruling, Transnational argues Pegasus failed to prove that fuel prices ever dropped below $3.75 per gallon.  Transnational, however, had the burden to show the trial court erred in denying Transnational's damage claim, and Transnational did not submit evidence disputing Prero's testimony that fuel prices at the relevant times were below $3.75 per gallon.  Because Transnational has not shown the trial court erred in denying Transnational's claim for damages based on the average fuel cost, we do not address Transnational's laches argument.[13]

      E.    *The Trial Court Did Not Err in Denying*
          *Transnational's Request for Prejudgment Interest*

Transnational asked for prejudgment interest under section 3287, subdivision (a), which "provides that '[e]very person who is entitled to recover damages certain, or capable of being made certain by calculation, and the right to recover which is vested in him upon a particular day, is entitled also to recover interest thereon from that day.' "Under this provision,

---

[13]    For the same reason we do not address Transnational's related tit-for-tat argument that, because the trial court applied laches to bar Transnational's claim for damages based on credit memo errors, the court should also have applied laches to Pegasus's claim for an offset for a "Russia trip."  That argument appears to be based entirely on the propriety of the trial court's application of laches in the first instance, which we do not address.  Moreover, with regard to the offset for the Russia trip (and other trips), the trial court stated that the offsets were "supported by the record" and that Transnational "presented no argument to counter the[ ] claimed offsets."

prejudgment interest is allowable'" as of right "'where the amount due plaintiff is fixed by the terms of a contract, or is readily ascertainable by reference to well-established market values. [Citations.]  On the other hand, interest is not allowable where the amount of the damages depends upon a judicial determination based on conflicting evidence.'"'" (*Thompson v. Asimos*, *supra*, 6 Cal.App.5th at p. 991; accord, *State of California v. Continental Ins. Co.* (2017) 15 Cal.App.5th 1017, 1038; see *Glassman v. Safeco Insurance Company of America* (2023) 90 Cal.App.5th 1281, 1316 ["'damages are unascertainable if the amount . . . depends on disputed facts or the available factual information is insufficient to determine the amount; and damages are ascertainable if the only impediment to the determination of the amount is a legal dispute concerning liability or the measure of damages.'"].)

        "'From the defendant's perspective, the certainty requirement promotes equity because liability for prejudgment interest occurs only when the defendant knows or can calculate the amount owed and does not pay.' [Citation.]  Under the applicable test for certainty, 'a dispute or denial of *liability* does not make the *amount of damages* uncertain.  [Citation.]  As stated by [the] Supreme Court:  "Generally, the certainty required of [section 3287, subdivision (a)], is absent when the amounts due turn on disputed facts, but not when the dispute is confined to the rules governing liability."'" (*Thompson v. Asimos*, *supra*, 6 Cal.App.5th at pp. 991-992, fn. omitted; accord, *Watson Bowman Acme Corp. v. RGW Construction, Inc.* (2016) 2 Cal.App.5th 279, 293-294; see *Wisper Corp. v. California Commerce Bank* (1996) 49 Cal.App.4th 948, 960 ["'[t]he test for recovery of prejudgment interest . . . is whether *defendant*

actually know[s] the amount owed or from reasonably available information could the defendant have computed that amount'"].) Prejudgment interest is not available when the amount of damages "'"depends upon a judicial determination based upon conflicting evidence and is not ascertainable from truthful data supplied by the claimant to his debtor.'"'" (*Wisper*, at p. 960; see *Warren v. Kia Motors America, Inc.* (2018) 30 Cal.App.5th 24, 45.) "Thus, where the amount of damages cannot be resolved except by verdict or judgment, prejudgment interest is not appropriate." (*Wisper*, at p. 960; see *Stein v. Southern Cal. Edison Co.* (1992) 7 Cal.App.4th 565, 573.)

Also relevant are whether an accounting is required to determine the amount of damages (see *Stein v. Southern Cal. Edison Co.*, *supra*, 7 Cal.App.4th at p. 573 ["[w]here the amount of damages cannot be resolved except by account, . . . interest prior to judgment is not allowable"]; *Chesapeake Industries, Inc. v. Togova Enterprises, Inc.* (1983) 149 Cal.App.3d 901, 909 ["an accounting action is prima facie evidence a claim is uncertain"]) and the disparity between the amount of damages demanded in the complaint and the ultimate award (*Wisper Corp. v. California Commerce Bank*, *supra*, 49 Cal.App.4th at p. 961; *Chesapeake Industries*, at p. 910). These factors may indicate the defendant could not have known or calculated the amount owed before trial and weigh against awarding prejudgment interest. (See *Chesapeake Industries*, at p. 907 ["that the plaintiff or some omniscient third party knew or could calculate the amount is not sufficient" to award prejudgment interest]; see also *Glassman v. Safeco Insurance Company of America*, *supra*, 90 Cal.App.5th at p. 1316.) "'"On appeal, we independently determine whether damages were ascertainable for purposes of the statute, absent a

43

factual dispute as to what information was known or available to the defendant at the time.""" (*State of California v. Continental Ins. Co.*, *supra*, 15 Cal.App.5th at p. 1038; see *Watson Bowman Acme Corporation v. RGW Construction, Inc.*, *supra*, 2 Cal.App.5th at p. 296.)[14]

The trial court denied Transnational's request for prejudgment interest because the court concluded the trial involved "a lengthy accounting of myriad and ever-changing unliquidated damages claims for damages on various alternative theories, with [Transnational] ultimately recovering a small fraction of the amount claimed." Transnational sought damages of $2,620,918 and received $254,581.11, before the court awarded costs.

Contrary to Transnational's argument,[15] Pegasus could not have ascertained before trial the amount of damages it owed

---

[14]     Pegasus cites *Bullis v. Security Pac. Nat. Bank* (1978) 21 Cal.3d 801 for the proposition that the standard of review for a trial court's ruling on prejudgment interest is abuse of discretion. That case, however, involved a request for prejudgment interest under section 3288, which concerns actions for the breach of an obligation not arising from contract, not section 3287, subdivision (a). (See *Bullis*, at p. 815.)

[15]     Pegasus argues Transnational waived its arguments regarding prejudgment interest because Transnational filed a motion to vacate the part of the original judgment denying prejudgment interest, and then filed a notice of appeal before the trial court could rule on the motion to vacate. However, Transnational requested prejudgment interest before judgment, and the trial court denied that request in a judgment properly appealed by Transnational. Transnational preserved the issue of prejudgment interest. (See *Watson Bowman Acme Corp. v. RGW*

44

Transnational. In contrast to cases where the amount of damages is readily ascertainable by reference to contract provisions, the parties here vigorously disputed how to compute Transnational's damages. These disputes included how many hours of uncredited and under-credited flights were at issue (an issue ultimately resolved by stipulation during trial); whether fuel surcharges applied to certain flights, and if so, the amount of the fuel surcharge; whether certain flight hours were attributable to Pegasus's business purposes; and how many hours should be attributed to offsets for Pegasus based on over-credited flights and other errors in the credit memos. The case was a years-long factual mess. (See *Warren v. Kia Motors America, Inc.*, *supra*, 30 Cal.App.5th at p. 45 [plaintiff was not entitled to prejudgment interest where the amount of certain damages "could not be ascertained 'by looking at the sale contract'"]; *Chesapeake Industries, Inc. v. Togova Enterprises, Inc.*, *supra*, 149 Cal.App.3d at pp. 907-908, 910 [lessor was not entitled to prejudgment interest where the lessee could not ascertain what it owed under the lease and there was a significant discrepancy between the amount of the lessor's claim and the amount of the judgment].) The factual disputes concerning the amount of Transnational's damages were sufficiently complex that Transnational requested an accounting, alleging it was "essential to determine the precise amount of monetary damages that [Transnational] might have sustained as a result of breaches by Pegasus . . . of their agreement set forth in the claims for breach of contract."

*Construction, Inc.*, *supra*, 2 Cal.App.5th at pp. 297-298 [a request for prejudgment interest is timely so long as it is made before a judgment is entered, and "[n]o statutes specify the timing or mechanism for seeking prejudgment interest"].)

Although Transnational inexplicably contends it never requested or received an accounting, it did, and the trial court even denied Pegasus's motion for judgment on Transnational's accounting cause of action and essentially ruled the 20-day trial satisfied Transnational's request for an accounting.

The kinds of cases where courts award prejudgment interest are nothing like this case. For example, in *Leff v. Gunter* (1983) 33 Cal.3d 508, a case cited by Transnational, the court awarded prejudgment interest under section 3287, subdivision (a), based on "uncontested and conceded evidence" of the components of the calculation to determine the amount of damages. (*Id.* at p. 20.) Similarly, in *Watson Bowman Acme Corp. v. RGW Construction, Inc., supra*, 2 Cal.App.5th 279 the court held prejudgment interest was appropriate because the defendant could have determined the amount owed the plaintiff based on the prices the plaintiff quoted the defendant before litigation. (*Id.* at p. 299.) The court in *Watson* stated that the defendant "'offered no evidence to contradict' the amount" asserted by the plaintiff and that therefore "it was not a case in which the 'amounts due turn on disputed facts.'" (*Id.* at p. 303; see *Olson v. Cory* (1983) 35 Cal.3d 390, 402 [prejudgment interest was appropriate where the amount due the plaintiffs was based on one of two statutory provisions, and which statute applied was a question of law]; *Stein v. Southern Cal. Edison Co., supra*, 7 Cal.App.4th at p. 573 [prejudgment interest was appropriate where "the amount claimed in the complaint was the amount awarded by the jury," and "[a]scertainment of the amount did not require an accounting from conflicting evidence"].)

Moreover, at the outset of this action, Transnational's request for damages was based on different claims than those it

ultimately litigated, and Pegasus filed a cross-complaint based on costs Pegasus allegedly incurred during the leases for the 771 and 772 planes that Transnational refused to pay. Given the changing litigation landscape, the factual disputes the trial court resolved through a 20-day trial that amounted to an accounting of Transnational's charter business with Pegasus, and the significant disparity between the damages Transnational requested and the damages it recovered, the trial court did not err in denying Transnational's request for prejudgment interest.

## DISPOSITION

The judgment is affirmed. Pegasus is to recover its costs on appeal.


SEGAL, J.


We concur:


PERLUSS, P. J.


FEUER, J.

47